## WILLIAM BOBBY FOWLER, JR. *v.* STATE OF MARYLAND

[No. 37, September Term, 1968.]

652

*Decided May 5, 1969.*

*John D. Hackett,* with whom was *E. Thomas Maxwell, Jr.,* on the brief, for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Howard M. Cardin, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

On November 6, 1966 at approximately 4:15 p.m., Linda Keller, a seventeen year old nurse's aid (referred to in hospital

parlance as a "Pinkie"), was found nude, bloody, and beaten in the boiler room of the Church Home and Hospital in Baltimore. She had been stabbed numerous times and her clothes were missing. She died five days later without regaining consciousness.

Appellant, an employee of the hospital, was arrested at his home on March 25, 1967 on a charge of negotiating a stolen certified check. He was interrogated by the police about this offense on March 25 and 26, and on March 27, for the first time, he was questioned about the Keller homicide. On March 30, 1967 appellant gave a statement to the police in which he admitted stabbing Miss Keller.

Appellant was subsequently charged with the first degree murder and rape of Linda Keller. The State's case against him was founded primarily on his incriminatory statement. A motion to suppress the statement having been filed by the appellant on the ground that it was not freely and voluntarily given, the trial judge, out of the presence of the jury, took extensive testimony, at the conclusion of which he ruled that the statement, being voluntary, was admissible. The jury found appellant guilty of murder in the first degree and rape, and the court thereafter sentenced him to life imprisonment and twenty years on the respective charges. Appellant contends on this appeal that the trial judge erred in admitting the statement in evidence.

I

We noted in *Barnhart v. State*, 5 Md. App. 222, that in a criminal case tried before a jury, the question whether a challenged confession is admissible in evidence is solely for the determination of the trial judge; that he first hears evidence out of the presence of the jury to determine whether the confession was freely and voluntarily made; that if he finds from the evidence that *prima facie* proof exists to establish that the confession was voluntarily given, and therefore decides to admit it, the same evidence is thereafter to be presented to the jury, as it has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed.[1] But before the trial judge may

---

1. In making his preliminary determination, the trial judge need

admit the challenged confession in evidence, the State must prove that it was voluntary and not the product of force, threats, promises, or inducements. *Abbott v. State,* 231 Md. 462; *Robinson v. State,* 3 Md. App. 666; *Cooper v. State,* 1 Md. App. 190. Otherwise stated, to be voluntary a statement cannot be "extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan,* 378 U. S. 1, 7. In post-*Miranda*[2] trials, where the State seeks to introduce a statement taken from an accused during a period of custodial interrogation by police, it must, as part of its proof of voluntariness, affirmatively show that all warnings required to be given to an accused by that case prior to such interrogation were so given, *Robinson v. State,* 1 Md. App. 522, and that the accused, in giving the statement, understood his rights and knowingly and intelligently waived them, *Johnny Mack Brown v. State,* 3 Md. App. 313. Specifically, the State is required by *Miranda* to affirmatively show that the accused was advised prior to such interrogation (1) that he had a right to remain silent, (2) that anything he said may be used against him in court, (3) that he had the right to consult with a lawyer and to have the lawyer with him during interrogation, and (4) that if the accused was unable to afford a lawyer, one would be appointed to represent him. See *Hale v. State,* 5 Md. App. 326. Once warnings have been given, *Miranda* states that "the subsequent procedure is clear," namely:

> "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without

not find beyond a reasonable doubt that the confession was voluntary. The ultimate determination of the question of voluntariness by the jury, however, is a question of fact and for the jury to consider the confession, it must find that it was freely and voluntarily made beyond a reasonable doubt. *Barnhart v. State, supra.*

2. *Miranda v. Arizona,* 384 U. S. 436.

> the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (at pages 473-474)

Prior to questioning, the person to be interrogated "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda* at page 444. In other words, questioning may proceed if the person to be interrogated understands the import of his *Miranda* safeguards, and effectively waives them. *Myers v. State,* 3 Md. App. 534 (footnote 1). But where custodial interrogation is undertaken without the presence of an attorney, and a statement is taken, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda* at page 475. And equally plain from *Miranda* is the flat holding, at pages 475 and 479, that no evidence obtained as a result of a custodial interrogation can be used against an accused unless and until the prosecution demonstrates a waiver of constitutional rights within the meaning of *Johnson v. Zerbst,* 304 U. S. 458, a case which holds that waiver of a fundamental constitutional right is ordinarily an "intentional relinquishment or abandonment of a known right or privilege," the determination of which "must depend in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Within this framework, the *Miranda* court, in the course of its opinion, articulated further guidelines governing waiver of an accused's right against self-incrimination and to retained or appointed counsel at the interrogation, namely:

    (1)   "An express statement that the individual is

willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." (at page 475)

(2) "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." (at page 475, quoting from *Carnley v. Cochran*, 369 U. S. 506)

(3) "That the accused's failure to ask for a lawyer does not constitute a waiver." (at page 470)

It has been held that an express statement by an accused undergoing custodial interrogation that he understood his *Miranda* rights, and nevertheless wanted to make a statement is not an essential link in the chain of proof of waiver, since waiver may be shown "by the attendant circumstances." See *United States v. Hayes*, 385 F. 2d 375 (4th Cir.), *cert. den.* 390 U. S. 1006; *Miller v. State*, 251 Md. 362; *Mullaney v. State*, 5 Md. App. 248. The ultimate determination of whether the accused knowingly and intelligently waived his *Miranda* rights before making a statement is governed, in the final analysis, by whether the particular facts and circumstances surrounding the case are such as to demonstrate an intelligent and intentional relinquishment or abandonment of a known right or privilege. *Brown v. State, supra.*

A

On the preliminary question of the admissibility of appellant's statement, the following evidence was introduced out of the presence of the jury:

On March 25, 1967 appellant was arrested at his home by Detectives Vincent DiCarlo and Joseph Folio on a charge of negotiating a stolen certified check.[3] He was taken to the North-

---

3. At the outset of the hearing, appellant stated that he did not question the legality of this arrest.

658

eastern Police Station and booked at 11:30 a.m. He was interrogated for the first time from 4:30 to 5:30 p.m. by Sergeant Charles Siford in the presence of Folio and DiCarlo, the interrogation not being in connection with the Keller homicide. Sergeant Siford testified that prior to interrogating appellant about this offense,

> "I advised him of his absolute right to remain silent. Also, anything he said would be used against him in court. Advised him there would be no threats or no promises made to him. Also he have a right to have a lawyer, that if he couldn't afford a lawyer, one would be appointed for him and that during any interrogation, if he expressed the desire to have a lawyer present, that all interrogation would cease until a lawyer was made available and if one wasn't made available, there would be no more interrogation."

The record is silent as to what, if any, response appellant made after these warnings were given to him. In other words, Siford was not asked, and did not state, whether appellant said he understood the warnings, that he nevertheless wanted to talk to the police, and did not want an attorney present.

Siford testified further that appellant was interrogated again about offenses unrelated to the Keller homicide from 7:30 to 9:30 p.m. that same night, and was again advised of his *Miranda* rights in the same terms as above specified. The record does not indicate what, if any, response appellant made after the warnings were given to him by Sergeant Siford.

Siford testified that on March 26, appellant talked to his wife, presumably by phone from 8:50 to 9:08 a.m.; that he talked to his brother from 9:40 to 9:52 a.m. on the 26th; that he was thereafter interrogated by Siford about unrelated offenses in the presence of Folio and DiCarlo from 1:45 p.m. to 3:45 p.m., during which period appellant was visited by another brother for approximately forty-five minutes, and was later visited by another brother from 7:30 to 7:45 p.m. According to Siford, appellant was once again warned of his *Miranda* rights in the detail hereinabove specified. The record fails, however, to disclose appellant's response, if any, to the warnings.

On March 27 appellant was again interrogated from 9:45 a.m. to 12:45 p.m. about unrelated offenses, and took a polygraph test during that period of time. At 2:55 p.m., he was for the first time taken to the Homicide Squad for questioning. At 6:55 p.m., he was placed in a lineup in connection with an unrelated offense. Siford stated that appellant was given the *Miranda* warnings prior to his interrogation on the 27th, but the record does not show appellant's response, if any, thereto.

On March 28 appellant was visited by his mother and sister from 10:20 to 10:55 a.m., after which he was taken to the Bureau of Identification and thereafter to a preliminary hearing on a charge unrelated to the Keller homicide. The preliminary hearing was postponed. Thereafter, appellant was taken to the Homicide Squad for further questioning, stopping en route at appellant's home to permit him to visit briefly with his wife. Appellant was interrogated briefly by Captain Anton Glover of the Homicide Squad. At 10:35 p.m. he phoned his mother. Appellant was afforded his *Miranda* warnings at this interrogation but the record fails to disclose what, if any, response he made thereto.

On March 29 appellant called his mother between 12:40 and 12:44 p.m. and again at 1:00 p.m. Between 1:50 and 2:38 p.m. he was subjected to further interrogation by Siford on offenses unrelated to the Keller homicide, during which time he was advised of his *Miranda* rights. The record does not show appellant's response, if any, to these warnings. Appellant was given a preliminary hearing on an unrelated charge on March 29 and was held for action of the Grand Jury. He was then placed in the Baltimore City jail.

Asked whether a waiver was ever taken from the appellant of his *Miranda* rights, Siford testified: "No written"; that it was not departmental practice at that time to take written waivers after an accused had been advised of his *Miranda* rights, but that it has since become the practice to take written waivers.

Captain Anton Glover of the Homicide Squad testified that he briefly interrogated appellant about the Keller homicide on March 27 and 28 in the presence of Siford, DiCarlo, and Folio; and that he (Glover) advised appellant of his *Miranda* rights in the following terms:

"Advised he had a right to remain silent, had a right to counsel, if he couldn't afford counsel, counsel would be obtained for him. He had a right to know that what he said would be used against him in Court. He was also informed if he wished to talk to us, he had the right to have counsel present."

The record is silent as to what, if any, response appellant made to Glover's recitation of his *Miranda* rights.

Glover testified that his interrogation of appellant on both the 27th and 28th was brief because he had instructions from the State's Attorney's office that since appellant had been in police custody for such a length of time, was charged "with the rape of the young girl,"[4] was "locked up being charged with investigation of assault and shooting of an elderly woman," and also was being held "for a series of armed robberies," it would be advisable that he be placed in the Baltimore City jail "so we would not hinder the investigation of the District officers."[5] Appellant was, however, brought from the jail to the Homicide Squad for interrogation on March 30 "on a writ"[6] signed by a judge of the Supreme Bench of Baltimore City. Appellant arrived at the interrogation room at 3:45 p.m., and interrogation was undertaken by Glover in the presence of Siford, Detective Richard Bosak, DiCarlo and Folio. Glover advised appellant of his *Miranda* rights as follows:

"The right to counsel, if he couldn't afford counsel, counsel would be secured. Advised he could remain silent, anything he told us could be used in Court against him. He was told if he decided to talk to us, he could have counsel present."[7]

---

4. Apparently a rape charge not connected with the Keller crime.

5. Meaning the officers investigating appellant's connection with offenses unrelated to the Keller homicide.

6. The nature and terms of the "writ" are not shown in the record.

7. We have repeatedly pointed out that there must be a clear-cut showing in the record that the warnings required to be given by *Miranda* were in fact given—not just some of them, but all of them. There is no requirement that a police officer memorize the *Miranda* warnings and testify from his memory at the trial as to what he

Appellant's response, if any, to the warnings and to the recitation of his rights is not reflected in the record. In response to questioning between 3:45 and 4:20 p.m., appellant admitted knowing Miss Keller and to having worked at the hospital on the day the crime was committed.

According to Glover's testimony, Leonard Briscoe, an attorney and associate of Milton Allen, arrived at the interrogation room at 4:20 p.m. "to talk to his client"; that after appellant indicated a desire to talk to Briscoe, and Briscoe asked to be alone with his client, "Everyone left the room with the exception of the defendant and counsel"; that at 4:35 p.m. Briscoe called the officers back into the room; that Briscoe then asked whether appellant had been advised of his rights; that he (Glover) then again advised appellant in Briscoe's presence of his *Miranda* rights; that he (Glover) asked Briscoe if he wished to remain but Briscoe declined to stay, stating that he had to talk to another client; that Briscoe left at 5:30 p.m., having stayed, in all, about forty-five minutes to an hour;[8] and that when Briscoe left he told appellant "Mr. Allen would be in to see him."

Glover testified further that after Briscoe left, appellant stated that he would like a few minutes to himself to meditate; that appellant then said a prayer to himself, ten or fifteen minutes after which he indicated he wanted to talk alone to Siford; that he (Glover) and the other officers left the interrogation room and about three minutes later, at about 6:05 p.m., Siford came out

---

actually told the accused prior to interrogating him. The officer would be permitted to testify that he read the warnings to the accused from a so-called "*Miranda* card," followed by a reading into evidence of what was read from the card. If police officers persist in testifying from their memory, and inadvertently or otherwise omit one of the required warnings, the confession cannot be admitted. See *Hale v. State, supra.* The recitation of *Miranda* warnings to the appellant by Glover on the 30th—the day the confession was obtained—just barely satisfied that requirement of *Miranda* that the accused be told, in substance, that he has the right to consult with a lawyer and to have the lawyer with him during interrogation. See *Duckett v. State,* 3 Md. App. 563.

**8.** Glover later testified that Briscoe left at 4:35 p.m., staying only about fifteen minutes.

and said that appellant "wished to talk to us about the Keller case, Pinkie case"; that at 6:10 p.m. appellant was given a written mimeographed waiver form to read and execute, the form specifying in detail the four-fold *Miranda* warnings, and concluding as follows:

> "After reading the above [*Miranda* rights and warnings] and having my rights thoroughly explained to me, I, William B. Fowler, wish to talk to the police without an attorney present and this wish is of my own free volition, without any threats or promises."

Glover testified that appellant signed the waiver at 6:10 p.m. and then told the officers about the Keller crime; that his statement was subsequently reduced to writing beginning at 6:40 p.m., the statement being completed at 8:30 p.m.; and that prior to taking the written statement, appellant was again advised of his constitutional rights, as embodied in the statement, as follows:

> "Now William before you say anything I wish to advise you that you have the right to remain silent, you do not have to answer any questions without first being able to talk with your lawyer. If you cannot afford a lawyer we will make arrangement for you get a lawyer, also that anything that you say may be used against you in a court of law. There will be no threats or promises made to you in order to get you to make this statement it must be free and voluntary on your part do you understand what I have just said to you and are you still willing to talk with us about the assault of the 'Pinky?'
> "Yes Sir
> "Now Bobby you were visited a little earlier by a Mr. Leonard A. Briscoe, Attorney at Law associated with Mr. Milton Allen and he informed you that you will be represented by Mr. Allen still knowing this are you willing to talk with us about the assault of the 'Pinky?'
> "Yes Sir

"Now Bobby after being advised of your rights to remain silent, your right to an attorney and your right to the use of the telephone and knowing what you say may be used in court are you ready to give us a statement concerning the assault and homicide?
"Yes Sir"

On cross examination, Glover was asked why a waiver was not taken from appellant when he was first brought into the interrogation room at 3:45 p.m. on March 30. Specifically, Glover was questioned as follows:

"Q. Having been advised of his rights, why wasn't a waiver taken at that particular time?
A. Why should we take a waiver? He didn't indicate he wanted to give a statement.
Q. At this particular time, 3:45, he indicated he didn't want to give a statement?
A. He didn't indicate that he did not wish to talk to us.
Q. What did he indicate?
A. He spoke to us until such time as Mr. Briscoe arrived."

Detective Richard Bosak testified that on March 30 he and DiCarlo picked up appellant at the Baltimore City jail "on a writ" and took him to the Homicide Squad for interrogation; that appellant continued to maintain his innocence of the Keller homicide and "refused to talk about it," saying that he had nothing to do with it and was somewhere else when the crime was committed; that Briscoe arrived at 4:20 p.m. and while he (Bosak) didn't hear Briscoe request to be alone with his client, he was nevertheless left alone with him "in the corner"; that he (Bosak) thought Glover remained in the room while Briscoe interviewed appellant because all the officers were "all huddled in one area" of the room, about fifteen feet from appellant and Briscoe, the room being approximately 20' X 12' in size. According to Bosak, after Briscoe left, interrogation of appellant was resumed and he continued to deny involvement in the Keller crime until, at approximately 6:00 p.m., he said he wanted

to talk alone to Sergeant Siford. Bosak did not recall appellant asking for a period of silence so that he could meditate and pray.

Bosak further testified that he saw the appellant for the first time on March 28 when he was interrogated by Glover about the Keller murder. He stated that "we couldn't get any information whatsoever out of Mr. Fowler." He was then asked:

"Q. He didn't want to talk to you?
A. No.
Q. He told you?
A. He said he didn't know anything about it."

Sergeant Siford, recalled to testify, stated that he was alone with appellant for about three or four minutes at appellant's request at about 6:00 p.m. on March 30; that appellant told him he had something to tell him and began to cry. Siford then asked him "What he wanted to tell me," and after about thirty seconds of silence, appellant said "He killed the Pinkie." Siford then asked where he killed her and appellant stated at the Church Home and Hospital. At this point, Siford called Glover into the room, appellant repeated what he had told Siford, after which Glover called the other detectives into the room.

On behalf of appellant, Milton Allen, an attorney specializing in criminal law, with eighteen years experience at the Bar, testified that he was retained on March 28 to represent appellant by his relatives; that he knew appellant was a suspect in the "Pinkie case" and sent Leonard Briscoe, an attorney who did some work for him, to interview him; that at approximately 4:25 p.m. on March 30, Briscoe came into his (Allen's) office, interrupting a conference, to tell him that the police had the appellant at the Homicide Squad and would not permit him (Briscoe) to interview appellant privately; that he (Allen) called Glover by phone at 4:25 p.m., and told him that he was not to question appellant in his absence, and Glover so agreed; [9] that later that night, he learned from Briscoe that appellant had not been returned to the City jail and called Glover at approximately 8:00 p.m.; that he could not reach Glover at that time

9. Glover denied ever receiving such a call from Allen.

but Glover called him back at 8:30 p.m. and stated that appellant had made a statement.

Leonard Briscoe, a lawyer admitted to practice in 1965, testified that after Allen asked him to interview appellant, he located him on March 30 at the Homicide Squad where he was undergoing interrogation; that this had been his first contact with the Homicide Squad; that he told Glover that "he was not Mr. Fowler's lawyer," that he came to interview him for Milton Allen. Briscoe testified that he asked for, but was denied, permission to interview the appellant alone; that Glover stayed in the interrogation room throughout his entire interview with appellant; that most of the other officers remained near the door of the room but some went "in and out"; that the police officers were six to eight feet from him throughout the interview; and that he was "never alone with the defendant." Briscoe stated that as a result of Glover's refusal to permit him to confer privately with the appellant, he did not ask appellant about the case, since he did not wish to be overheard; that Glover told him, in response to his question, that appellant had been advised of his rights and appellant nodded in apparent agreement; that after securing some background information from appellant, he told him, "Remember you don't have to make any statement," and that he would attempt to see him in the morning at the jail. Briscoe testified that he was "puzzled" as to what to do because "I felt I did not represent the man," that he was Milton Allen's client; that at the time of his interview with appellant he did not know that he was a suspect in the Keller homicide; and that he remained at the Homicide Squad only about ten minutes, leaving at approximately 4:25 p.m.

Appellant testified that he was married, had three children, and had been employed prior to his incarceration for eleven months as a male aide in the emergency room at the Church Home and Hospital. He was not asked and did not give his age or the extent of his education.

He testified that on the day of his arrest, he was not advised of his constitutional rights; that during questioning on the 26th, he was advised of his rights; that his brother told him on the 26th that he was going to secure a lawyer for him and appellant

also told his wife to get him a lawyer; that on the 27th, he was interrogated by Glover with respect to the Keller homicide but was not advised of his rights; that he asked the police for an attorney three times that day but his requests were denied; that he was not thereafter advised of his rights, although he asked for a lawyer, in all, about twenty times. He testified that on the 29th his mother told him that she was getting a lawyer for him; that on the 30th he was taken from the City jail for interrogation at the Homicide Squad; that he was beaten during the interrogation by Bosak, who struck him a number of times; that he told police that he had nothing to say to them at that time; that Briscoe came in to the interrogation room and asked to talk to him "in private," but Glover refused the request; Briscoe told him that his parents had picked Milton Allen as the lawyer who was going to represent him and he told Briscoe that he wanted Allen to do so; that Briscoe asked him in Glover's presence whether he had been advised of his rights, and Glover responded that he had; that he (appellant) nodded his head to satisfy Glover because "I was shook up, tired, going through this thing. I just shook my head." Appellant testified that he agreed to sign over his check to Briscoe; that Briscoe said he would talk to him again at the jail; that after Briscoe left, Glover threatened to leave him alone with Bosak; that Siford told him that Bosak would beat him until he confessed; that he then requested permission to call Allen, but his request was denied; and that thereafter he completed a statement which Glover said wouldn't come up in court and he signed it because he was "sick of being pressed." He stated that prior to signing it, he requested that his lawyer be present but this request was refused.

On cross-examination appellant admitted that he didn't tell Briscoe that the police had beaten him nor did he tell Briscoe about his prior unsuccessful efforts to obtain an attorney. He admitted that Briscoe told him that he didn't have to make any statement to the police; that Briscoe also told him not to talk about his case in the presence of the police officers; that while Briscoe was interviewing him, the police stayed in the room. Appellant admitted prior convictions of burglary, larceny and two cases of storehousebreaking. He stated, in effect, that when

visited by his mother and brother, the police remained in the room with them.

The State in rebuttal called Captain Glover. He denied all of appellant's material allegations of brutality and coercion, and specifically denied that he or anyone in his presence told appellant that the statement he was signing was meaningless. He denied receiving a phone call from Milton Allen at 4:30 p.m. on March 30 and stated that he only talked to Allen one time on the 30th, this being at approximately 8:30 p.m. after appellant had made his statement. Asked by the trial judge whether "defendant at any time in your hearing requested counsel," Glover replied in the negative. On cross-examination Glover was asked to explain the delay in having appellant waive his *Miranda* rights. Glover testified that at 6:10 p.m. "we were prepared to reduce the statement to typewritten form and, before doing so, advised him [appellant] of his rights, read the waiver to him, asked if he was sure what he was doing," to which he responded that "he did." Glover was then asked:

"Q. Isn't it ordinary police procedure for a party to sign a waiver immediately after they have been advised of their constitutional rights?

A. No, Sir.

Q. In this case, you advised him of his rights at 3:45, waited until after six to get the waiver signed?

A. We waited until commencement of the statement. I had him sign the waiver, so that we knew he understood what we were talking about."

Glover confirmed his earlier testimony that Briscoe and appellant had been left alone for approximately five minutes—that all officers left the room.

Bosak testified in rebuttal, denying appellant's testimony that he had beaten him. He was asked:

"Q. While Mr. Briscoe was there, did there come a time when all of the officers in the room walked out of the room, leaving Mr. Fowler and Mr. Briscoe?

A. As I testified before, we all moved to the far end of the room and I was leaning against a cabinet.

668

Q. You were all still in the room?
A. We were all grouped together.
Q. In the room, but away from the two of them?
A. Yes."

Bosak was emphatic in his testimony that Glover stayed in the interrogation room, as did the other officers throughout the period that Briscoe interviewed the appellant. He stated that the officers were talking among themselves, that they were about ten feet away from Briscoe and appellant, standing by the doorway.

Sergeant Siford, testifying on rebuttal, stated that Briscoe never asked to be left alone with appellant. He was asked:

"Q. Did there come a time when Mr. Briscoe was present that all of the officers left the room?
A. No. but we, everyone got up and was more or less —all questioning was stopped and Mr. Briscoe was talking to the defendant.

\* \* \*

Q. What did they [the officers] do when they got up?
A. Well, I personally went over by the door. I don't know exactly what the other officers did. I think some of them may have went outside. I don't know.
Q. Where was the door in relation to Mr. Fowler?
A. I guess about five or six feet away."

Siford testified that at no time from March 25 to March 30 when appellant was in police custody did he ever ask for an attorney. He was later asked:

"Q. Did you ever hear him ask anyone for an attorney?
A. He called his brother in my presence, called his brother in the Homicide room, interrupted interrogation to call his brother and see if he had gotten a lawyer.

\* \* \*

Q. What did he say [on March 30], he wanted to call his brother to get an attorney?

A. Yes.

Q. What was the first date on which he said this, Sergeant Siford? Was it still while you had him in custody at Northeastern?

A. No, I'm speaking of the interrogation at Homicide on the 30th, that the interrogation was interrupted and he asked to use the phone.

Q. To get an attorney?

A. To call his brother to find out whether or not his brother had contacted an attorney. That is exactly what he said.

Q. After you heard this telephone call—what time was this call, by the way?

A. I don't know, but I know it was during the interrogation in the room."

Siford indicated that the phone call was made before Briscoe arrived but that thereafter the interrogation continued because appellant "didn't stress that he wanted an attorney," but only indicated that he wanted to call his brother to see what his brother was going to do "to get an attorney." Siford was asked:

"Q. Did he not express to you the fact that he wanted his brother to get an attorney for him?

A. Sounded like he wanted his brother to get an attorney.

* * *

Q. It was your understanding, was it not, that the defendant in this case wanted an attorney through his brother * * *?

* * *

A. Yes, but it was to no one. We didn't understand clearly. Understood that he did not ask for an attorney at this time, at the interrogation, because when Captain Glover advised him, he made it very clear that at any time if the defendant wanted the interrogation stopped and wanted the lawyer present, he could so have the lawyer."

Siford testified further that he stayed inside the interrogation room during the time Briscoe interviewed the appellant.

Detective Joseph Folio testified on rebuttal that when Briscoe came to see appellant, Siford, Glover, and Bosak all stood by the door while he and DiCarlo also stood "alongside the door"; that one of the officers was about a foot outside the door; that Glover never left the interrogation room but stood "in the doorjamb," during Briscoe's interview; and that Briscoe never asked to be left alone with his client. He testified that Briscoe and appellant were together for about three to six minutes. He denied appellant's allegations of brutality and coercion.

Detective Vincent DiCarlo testified on rebuttal that he heard Briscoe ask to be left alone with the appellant; that as a result, he got up and left and stood in the hall with Folio; that Siford and Bosak remained in the doorway. He couldn't remember where Glover went.

At the conclusion of the testimony on the motion to suppress appellant's confession, the State argued that appellant had an opportunity "to absorb" what was told him but nevertheless made a statement. The appellant argued that he was denied the right to have counsel present during the interrogation. In colloquy, the court noted that appellant was never told by an attorney not to talk to the police and that he never made a request of the police for counsel. The trial judge stated:

"Should not the request emanate from the Defendant (A) I want counsel; (B) refuse to talk until my counsel is present?"

The State agreed. Appellant then argued that Briscoe was not afforded an opportunity to confer privately with him. Without making any determination of the merits of this argument, the court stated that appellant did not ask Briscoe to remain during the interrogation, nor did Briscoe offer to remain, and that appellant signed a waiver of his *Miranda* rights. On this apparent basis, the court denied appellant's motion to suppress the confession. In doing so, we think the trial judge erred.

Under the Sixth Amendment to the Federal Constitution, applicable to the states through the Fourteenth Amendment, *Gideon v. Wainwright,* 372 U. S. 335, an accused person has the right to the effective assistance of counsel at all critical

stages of the criminal proceedings, including, under *Miranda* and its progenitor, *Escobedo v. Illinois,* 378 U. S. 478, the right to such assistance at and during the conduct of a custodial interrogation. Indeed, as we noted in *Duckett v. State,* 3 Md. App. 563, it is of the essence of the *Miranda* rationale that to fully protect the Fifth Amendment privilege against self-incrimination a person about to undergo custodial interrogation must be informed, in substance, "that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." We think it plain that the right to confer with counsel prior to questioning contemplates a consultation outside of the immediate earshot and superintending presence of law enforcement officers, particularly those who are to conduct or are conducting the interrogation. Both *Escobedo* and *Miranda* indicate that the presence of counsel in the interrogation room is to act as "a protective device to dispel the compelling atmosphere of the interrogation," thus assuring that the process of police interrogation conforms to the dictates of the privilege against self-incrimination. See *Miranda,* pages 465-466. Conversely, where the right to the effective assistance of counsel is denied at this critical stage of the proceedings, *Miranda* and *Escobedo* hold that the accused's dilemma has thereby become "heightened," making his later statements the product of police compulsion since the denial of the effective assistance of counsel has undermined the individual's ability to exercise his Fifth Amendment privilege. See *Miranda,* at page 466. While *Escobedo* involved the outright refusal of the police to permit an accused undergoing custodial interrogation (he being the prime suspect) to confer with his lawyer, the court held, in effect, that failure to afford an opportunity to the accused to consult with his attorney prior to or during questioning vitiated the later secured confession—that the "guiding hand of counsel" was essential to advise the individual undergoing interrogation of his rights "in this delicate situation," this being the stage when legal aid and advice were most critical to him. See *Escobedo,* at page 486.

Under the circumstances of this case, as shown by the evidence, we hold that appellant was denied his Sixth Amendment right to the effective assistance of counsel by reason of what in

effect was a refusal by the police to permit appellant a reasonable opportunity to confer privately with counsel. In this connection, we note that Briscoe's testimony was that his request to be alone with appellant was denied and that he could not, and did not, interview appellant properly because the police remained in the room about six to eight feet from where he was attempting to confer with the appellant. Briscoe's testimony in this respect was corroborated by that of Allen and the appellant. Glover's testimony confirmed Briscoe's to the extent that he admitted that Briscoe had requested the right to confer privately with appellant. But Glover said that all the officers left the interrogation room as a result of Briscoe's request, while the testimony of Bosak was that none of the officers left the room—that they all stayed about ten to fifteen feet from where Briscoe and appellant were conferring. Although Siford couldn't recall that Briscoe requested a private consultation with appellant, he, like Bosak, admitted staying in the interrogation room throughout the interview—about five or six feet away from Briscoe and appellant. Folio testified that Siford, Glover and Bosak remained in the interrogation room throughout Briscoe's conference with appellant, with Glover standing in the doorjamb. Unlike Bosak, Siford or Folio, DiCarlo heard Briscoe make a request for a private interview and while he then left the room, he testified that Siford and Bosak stayed in the interrogation room near the door. Briscoe's testimony, confirmed by appellant, was that they didn't discuss the case because of the presence of the police officers. Bosak's testimony was that despite the presence of the police in the interrogation room in such proximity to appellant and Briscoe, they nevertheless could not overhear the conversation. Briscoe testified that he remained only ten minutes. Glover estimated that he remained fifteen minutes to an hour. The other officers indicated that Briscoe remained only about fifteen minutes.

We do not hold that an accused undergoing custodial interrogation is denied the effective assistance of counsel in every case where a police officer is present in the area of the attorney-client consultation. The right of the person being questioned to consult with an attorney may, of course, be subjected to reasonable security safeguards. Where, as here, however, the State's

own testimony showed that over the attorney's objection, from three to five police officers remained in a 20′ X 12′ interrogation room while the attorney sought to confer there with the appellant—the police standing at a distance of from six to fifteen feet away for the duration of the consultation—we think such conduct on its face cannot be justified on the ground that it comprised a reasonable security measure; particularly since the police did not so seek to justify it and offered no explanation for their continuing presence other than, as three of the officers testified, they were not requested to leave — testimony flatly contradicted by two other officers.

In determining the question whether the police, by their actions, either intentionally or otherwise, denied the effective assistance of counsel to an accused during the conduct of the interrogation, we deem it proper to consider the background under which the interrogation was conducted. From the time of appellant's arrest on March 25 up to and through Briscoe's visit on March 30, appellant maintained his innocence of the crime. The testimony of Bosak was that on March 28 appellant stated that he didn't want to talk to the police and that again on the 30th he refused to talk about the case. Glover's testimony was that on March 30 appellant didn't want to give a statement, although he didn't indicate "that he did not wish to talk to us." This testimony, coupled with appellant's testimony that he didn't want to talk to the police, brings into focus the holding in *Miranda* that if the individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease"; and that any statement taken after the person invokes his privilege to remain silent "cannot be other than the product of compulsion, subtle or otherwise." *Miranda* at pages 473-474.

And while Glover and Siford testified that appellant never requested counsel, Siford later testified that during interrogation on March 30, prior to Briscoe's visit, appellant requested permission to call his brother so that his brother could get him an attorney; that he (Siford) understood at that time that appellant wanted an attorney, but that nevertheless the interrogation continued because appellant "didn't stress that he wanted an attorney." Testimony of this character, coming in as part of

the State's case, calls into play *Miranda's* holding at pages 473-474 that "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present," as the individual at that time "must have an opportunity to confer with the attorney and to have him present during any subsequent questioning."

Equally to be considered is the fact, so entirely evident from the record, that while the police gave appellant all warnings required by *Miranda* at the outset of each of his numerous interrogations, there is absolutely no showing of an express waiver of appellant's rights under *Miranda* to remain silent and to consult with and/or have counsel present during the interrogation until *after* he orally admitted to .Siford and Glover that he killed Linda Keller. As heretofore indicated, not only must the *Miranda* rights and warnings be recited at the outset of the custodial interrogation, but the interrogation may not proceed unless and until the individual waives effectuation of these constitutional rights voluntarily, knowingly, and intelligently. One of *Miranda's* strongest teachings is that waiver of constitutional rights cannot be found from a silent record—that (page 475) "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." And as *Miranda* states at page 476:

> "Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. It is inconsistent with any notion of a voluntary relinquishment of the privilege. * * *"

And the assumption of the trial judge that the appellant waived his right to counsel because he never asked the police for a lawyer cannot be squared with *Miranda's* express holding at page 470 that the accused's "failure to ask for a lawyer does not constitute a waiver."

It is also readily gleaned from the testimony of Siford and Glover that they did not think it necessary to obtain any waiver of appellant's *Miranda* rights at the outset of interrogation, but only if the appellant, after he had been subjected to questioning, implicated himself in the crime and indicated a willingness to make a statement. An express waiver secured for the first time after the person being questioned admits complicity in the crime comes too late to constitute a valid waiver of rights within the contemplation of the *Miranda* decision. See *Delone Brown v. State,* 6 Md. App. 564.[10]

Each of these factors, though bearing indirectly on the question of whether appellant was denied the effective assistance of counsel by reason of the actions of the police when Briscoe sought to confer with appellant on March 30, provides some insight into the circumstances under which appellant was being interrogated at the time of Briscoe's arrival on the scene. Additionally, appellant's presence in the interrogation room on March 30 was in obedience to a "writ" of unspecified character and it is likely that he was not voluntarily in the interrogation room. And just prior to Briscoe's arrival appellant had admitted for the first time that he knew Linda Keller—a fact which he previously denied, and which the police likely took as indicative of some progress in their quest to gain a confession. It was under these circumstances that Briscoe arrived to confer with appellant—the first and only lawyer that appellant had seen since the time of his arrest five days earlier. That the police recognized Briscoe as a lawyer sent to consult with appellant is clear, and while Briscoe expressed some uncertainty as to the extent of his own involvement in the case, it is apparent to us that he undertook to confer with appellant in the capacity of an attorney representing a client.

As we have indicated, we think the evidence shows that appellant's constitutional right to confer with counsel was circum-

---

10. Of course, an express statement by an accused about to undergo custodial interrogation to the effect that he understands his *Miranda* rights and nevertheless wants to make a statement without prior consultation with counsel is not necessarily an essential link in the chain of proof of waiver. See *Anderson v. State,* 6 Md. App.

scribed by the police to a degree denying him his Sixth Amendment right to the effective assistance of counsel. Under the circumstances, Briscoe's parting advice to appellant that he didn't have to make any statement to the police cannot be considered as an effective substitute or equivalent of the right to meaningfully confer with counsel.

Nor can it be held that appellant's post-confession written waiver of the right to consult with counsel and have him present during interrogation vitiated or in some manner cured the earlier denial by the police of appellant's right to the effective assistance of counsel. Appellant's comprehension of the scope of the right to confer with counsel was that which he observed when Briscoe came to consult with him, and since he did not appreciate the full extent of that right, he could in no event be deemed to have waived it. See *Rock v. State,* 6 Md. App. 618; *Hale v. State, supra; Duckett v. State, supra.* We thus conclude that appellant was not afforded his right to meaningfully confer with his counsel—that he was denied the effective assistance of counsel—and that his confession, subsequently secured within a few hours thereafter under the conditions herein outlined, was improperly admitted in evidence in violation of the principles espoused by the *Miranda* decision. See the Annotation in 5 A.L.R. 3rd 1360-1399, entitled *Scope and Extent, and Remedy or Sanctions for Infringement, of Accused's Right to Communicate with His Attorney.* See also *McClelland v. State,* 4 Md. App. 18.

In view of our conclusion, we need not consider other questions raised on this appeal.

*Judgments reversed.*
*Case remanded for a new trial.*