RICHARD JERRIMIAH PONDS, III *v.*
STATE OF MARYLAND

[No. 480, September Term, 1974.]

*Decided March 13, 1975.*

The cause was argued before MENCHINE, MOORE, LOWE and MELVIN,■ JJ.

*Stephen R. Creyke,* with whom were *Williams, Haynes & Creyke* on the brief, for appellant.

*Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County* and *Darrel Longest, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court. MOORE, J., dissents and filed a dissenting opinion at page 177 *infra.*

Richard Jerrimiah Ponds, III, in a bench trial in the Circuit Court for Montgomery County, was found guilty of nighttime breaking and entering of a dwelling with intent to steal personal goods of another. (Article 27, § 30) He was sentenced to a term of 6 years upon conditions authorized by Article 27, § 641A.

A written stipulation of facts, clearly establishing the *corpus delicti,* was made. The case then proceeded on the issue of criminal agency. The State offered a confession by the accused to establish criminal agency. The appellant

contends that the confession was not freely and voluntarily given and was improperly admitted in evidence. His contention essentially is based upon the fact that he testified that specific promises by police officer McFee had been made without specific rebuttal by the State.

Relying heavily upon *Streams v. State*, 238 Md. 278, 208 A. 2d 614, appellant in substance suggests that its teaching is that general disclaimers by police of threats, force, promises or inducements will not suffice to negate specific charges of particular promises, threats, inducements, or applications of force made by the accused. The contention overstates the teaching of *Streams*. In *Streams*, one police officer had testified that "he had done all of the interrogation on Wednesday and Friday" and that there was no mistreatment, no threats, and no inducements to the accused by him or by anyone in his presence. The accused, however, thereafter testified that *other officers* had made promises and offered inducements to him at times other than those described by the witness. *Under those circumstances* the Court in *Streams* said at 281-82 [615]:

> "We think the State did not meet its burden of showing that the confessions were freely and voluntarily made and were not products of promises or threats. *Sergeant Tabeling's testimony* that during all of the interrogations he and Officer Butler were the only officers present and that neither he nor anyone in his presence made any threats or promises to get Streams to give any information, and similarly no · immunity or inducements were offered or held out to him, *might have been enough if there were no later uncontradicted contentions to the contrary, and if Streams had not admittedly been in the custody of other officers who, he says, made statements to him and questioned him.* We do not agree with the appellant's contention that each person who has casual contact with the accused while he is detained by the police or who is present during the

interrogations that lead to a confession must testify as to its voluntariness in order for the State to meet its burden. *Bagley v. State,* 232 Md. 86; *Glaros v. State,* 223 Md. 272; *Glover v. State,* 202 Md. 522; *Cooper v. State,* 205 Md. 162; *Jackson v. State,* 209 Md. 390. *It may be enough if one credible witness can testify from personal observation that nothing was said or done prior to and during the obtention of the confession to mar or destroy its voluntary character and there is no claim by the prisoner of improper treatment by others than those covered by such testimony.* " (Italics supplied)

The later case of *Price v. State,* 261 Md. 573, 277 A. 2d 256, wherein the accused alleged that he had been told that "if you give a statement it won't do you no harm in the courtroom, something like that," and where the interrogating officers generally had denied that promises or inducements had been made, the Court of Appeals said at 582 [261]:

" 'We think the appellant's testimony * * * in view of its qualifications * * * too general, too lacking in specificity and too uncertainly stated to provide the foundation for an allegation of an illegal inducement requiring the State specifically to controvert it as part of its proof of voluntariness.' Cf. *Streams v. State,* 238 Md. 278, 281, 208 A. 2d 614 (1965).

"We think the general denials of inducement by the police officers involved in the interrogation, together with Captain Cadden's testimony that he had read and explained the *Miranda* warnings to the accused prior to interrogation, one of which warnings specifically provided that anything appellant said 'may be used against him in a court of law,' was sufficient to meet the inducement challenge."

The decision in *Price* makes plain that under some circumstances general, as distinguished from specific,

denials of inducement will suffice to meet the inducement challenge.

In the case of *Gill v. State,* 265 Md. 350, 289 A. 2d 575, on the other hand, the circumstances were such that denial of specific contentions by the accused was essential to a determination of the basic issue. In *Gill,* the accused claimed inducements had been made to him when he was alone in the company of one Hyson. It was uncontradicted that Gill had in fact been in the latter's sole presence during the course of interrogation prior to confession. The Court of Appeals pointed out at 354 [577]:

" * * * that specific person must rebut the allegations of coercion as no one else is qualified to do so."

Thus, since Hyson had not testified, the *only* evidence was that the alleged promise or inducement had been made.

This Court has pointed out that there is no magic as to *when* testimony in denial of promises or inducements must be made. In *Burks v. State,* 1 Md. App. 81, 227 A. 2d 355, where denial of threats, force or inducements had been made *before* the accused had testified, we said at 84-85 [357]:

"To require the State to re-ask these questions of Corporal Maddox minutes after he had anticipatorily rebutted Burks' allegations would be a needless gesture. This factor, alone, takes the case at bar out of the holding in *Streams.*

"There can be no question that the State has the burden of proving that a confession is freely and voluntarily given, without the influence of favor, threat, promise or inducement. *Bagley v. State,* 232 Md. 86; *Abbott v. State,* 231 Md. 462; *Williams v. State,* 231 Md. 83; *Bryant v. State,* 229 Md. 531. However, we do not construe the decision and opinion in the *Streams* case to require a finding in this case that the State has failed to meet the burden of proving the voluntariness of Burks' confession."

In *Harris v. State,* 1 Md. App. 318, 229 A. 2d 604, the

accused had testified that the police "told him if he signed the statement he could go home, that he would be tried in juvenile court, that he was crying because his back hurt and that one of the officers rubbed his 'stick' across the table near appellant's hand but that it never touched his hand because he kept moving his hand away" (at 323 [606-07]). The police had testified generally "that neither they nor anyone in their presence offered the appellant any immunities or rewards, made him any promises, threatened him or used any force or violence on him and that the statement was free and voluntary" (at 322 [606]). In those circumstances, this Court, citing *Streams, supra,* said at 323 [607]:

> "It may be enough if one credible witness can testify from personal observation that nothing was said or done prior to and during the obtention of a confession to mar or destroy its voluntary character and there is no claim by the prisoner of improper treatment by others than those covered by such testimony."

We believe, in short, that *Streams* intended no deviation or departure from the governing rule of law long applied in this State. In *Mulligan v. State,* 18 Md. App. 588, 598, *et seq.,* 308 A. 2d 418, 424, *et seq.,* we discussed in considerable depth the Supreme Court cases of *Jackson v. Denno,* 378 U. S. 368, 12 L.Ed.2d 908, and *Lego v. Twomey,* 404 U. S. 477, 30 L.Ed.2d 618, and pointed out that Maryland long had adhered to the rules of law declared in those decisions. In *Mulligan,* we pointed out (at 601 [425]), "while Maryland has articulated that the evidence must be *prima facie,* it has nevertheless, continuously been applying the preponderance of the evidence standard that a confession be freely and voluntarily made before it is admissible."

It is true, of course, that the Supreme Court in *Miranda v. State of Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, held custodial interrogation impermissible until the constitutional rights of an accused were protected by the

procedures mandated by that decision that the police must follow. See *Fowler v. State,* 6 Md. App. 651, 253 A. 2d 409, affirmed *State v. Fowler,* 259 Md. 95, 267 A. 2d 228. In the subject case an "Interrogation Rights and Waiver Form" containing a waiver of the full panoply of *Miranda* rights was executed by the accused. While appellant testified that he executed the document *after* rather than *before* his confession of the Ranier [subject] offense, and that his negative response to the question: "Do you want an attorney? " was placed upon the document *after* the confession in the Ranier incident had been made, the police testimony was in direct conflict therewith. The conflict in that evidence was a matter for resolution by the trial court. *Mouzon v. State,* 9 Md. App. 57, 60, 262 A. 2d 588, 590.

Where there is evidence to support the trial court's finding that the mandates of *Miranda v. Arizona, supra,* have been obeyed, the question whether a confession complying therewith is admissible is to be determined under the rule of law restated in *Mulligan, supra.* This issue of admissibility is to be determined as a matter of law by the trial judge. Where the evidence bearing upon the admissibility of a confession is such that specific charges of force, or threats, or promises in reality have been denied by a credible witness or witnesses, it is immaterial whether such denial is demonstrated by general or specific testimony, or whether it develops in the course of initial or rebuttal testimony.

Of course, in determining whether the court made its decision within the required constitutional framework, we must do so within the rule that when constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record. *Brookhart v. Janis,* 384 U. S. 1, note 4 at p. 4. *Gardner v. State,* 10 Md. App. 233, 245, 269 A. 2d 186, 192. In doing so we accord an appropriate and substantial effect to the trial court's resolution of conflicts in evidence as to the occurrence or nonoccurrence of factual events and happenings. *Wiebking, Holt & Wolf v. State,* 19 Md. App. 226, 233-34, 310 A. 2d 577, 581-82. The nature of appellate review in such cases carefully was enunciated by Mr. Justice

Goldberg in *Haynes v. Washington,* 373 U. S. 503, 83 S. Ct. 1336, 10 L.Ed.2d 513:

"It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here, see, e.g., Ashcraft v. Tennessee, 322 US 143, 147, 148, 88 L ed 1192, 1195, 1196, 64 S Ct 921; 'we cannot escape the responsibility of making our own examination of the record,' Spano v New York, 360 US 315, 316, 3 L ed 2d 1265, 1267, 79 S Ct 1202. While, for purposes of review in this Court, the determination of the trial judge or of the jury will ordinarily be taken to resolve evidentiary conflicts and may be entitled to some weight even with respect to the ultimate conclusion on the crucial issue of voluntariness, we cannot avoid our responsibilities by permitting ourselves to be completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding.' Stein v New York, 346 US 156, 181, 97 L ed 1522, 1540, 73 S Ct 1077. As state courts are, in instances such as this, charged with the primary responsibility of protecting basic and essential rights, we accord an appropriate and substantial effect to their resolutions of conflicts in evidence as to the occurrence or nonoccurrence of factual events and happenings. This is particularly apposite because the trial judge and jury are closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony."

We now examine the totality of the attendant circumstances of the subject case. The appellant is a young man of 21 years who had completed high school. He had been arrested at about midnight of August 11, 1972 after his

automobile was stopped on Georgia Avenue, in Montgomery County, Maryland. He was taken to a police station in Silver Spring. His father was notified of the arrest.

Police testimony was to the effect that the *Miranda* waiver form was read to Ponds and was signed at about 12:40 a.m. on August 12, 1972. The dispute on this issue will be demonstrated by the following two questions and answers to the appellant:

"Q You are saying you signed it after you gave your confession?

A Yes, sir.

Q And they say that you signed it before you gave the confession?

A Yes, sir."

### The Alleged Inducements

Appellant:

"Q Would you tell us prior to any statement which you may have given respecting this offense, the Ranier offense, what was said or done in that interrogation room?

A Officer McFee and Officer Staccone brought me in the interrogation room and took my handcuffs off and told me to wait there, and they left for five minutes. When they came back Officer McFee read me my waiver rights form. All through this time I did not know what to do. I kept very quiet. I had been told many time[s] if I were arrested to call a lawyer and I did not know if I should do that or not. I did not know what to do. After Officer McFee finished the waiver rights form he asked me if I wanted to talk to him and I said, 'I don't know. I don't know what to do.' He said, 'I will give you some time to think about it,' and I began thinking about it. I said I did not know what to do and after a

period of time he said, 'If you cooperate,' I want to get this right, 'If you show you want to straighten out, if you show you want to do the right thing, then when the commissioner asks us how you acted during the interrogation,' he said that they would tell him that I was a good person and that I am trying to straighten out.

Q You say commissioner. Do you mean the magistrate?

A Yes.

Q What was his function as you understood it at that time?

A To set my bond.

Q Please continue.

A I still do not know what to do. He said then, he said, 'Let me show you what I have on you,' and he showed me the evidence on the Ranier's case. I sat there and I still thought I don't know. I don't know what to do. I was still in a situation. I just didn't know what to do. So he showed me a yellow pad which had 15 names and addresses on it. Ranier was the bottom one. There were 14 other burglaries plus the Ranier's. He said, 'I know you did the Rainer's and I am pretty sure you did the rest of them. Now if you cooperate and we get it all over with tonight, then you will be home tonight, if you cooperate and talk to us. We all want to go home. We are all tired.' It was getting late in the morning. I looked at it and I looked at him and I said, 'Fifteen charges are a lot of charges.' He said that arresting officers have certain leeways with prosecuting attorneys, that they could suggest or recommend how a certain case should be handled, just how it should be handled. He said he was not promising me anything, but that if I showed cooper-

ation, that he would say in court if my lawyer asked him that I cooperated. I said, 'I don't know. Fifteen charges are a lot of charges.' He said that I was only formally charged with one charge and that he could by the next day he could convince his superiors to have four more warrants among the fourteen that were left on the page and be at my door with them. I then decided to talk to him. He said all of this before. This was after the waiver form and before I said anything because up to then I just did not know what to do.

Q What caused you to make that statement?

A I told him that I was worried I was going to spend the night in jail and no matter what my parents did they would not be able to pay my bond and I had no money myself, and he said sometimes when a suspect cooperates with the police and talks to them and shows them that he wants to straighten up that the magistrate does ask them and he would say how I acted and that he would tell them that he would recommend that I get personal bond. He also went on to say in response to when I asked about a lawyer, he said it was too late, it would be useless for us to talk about it now. He said it was too late to get one, 'I might as well just process him through.'

Q When was this, before any statement was made?

A This was before my statement was made. I then asked him how he would feel if I cooperated with him, how would he act in the courtroom and he said if I came back the next day with a lawyer to be present during questioning, that is when he made the statement about having four more warrants at my door the next day.

## The Denial of Inducements

Corporal McFee:

"'Do you want an attorney' and he answered 'No.'

Q Did you make any promises at all with regard to the case for which he had been arrested or arraigned or any other matters?

A No, sir, no promises were made.

Q Did you in any way threaten him?

A No, sir, no threats.

Q Did you make any statements to him at all with regard to an effort to elicit from him statements concerning the Ranier burglary prior to the time that you actually got the statement other than this execution of this form? [*Miranda* waiver]

A I made a general statement prior to his beginning to talk to us.

Q Was that before or after the form was executed?

A That was after the form.

Q What was the nature of that general statement?

A As a matter of routine practice whenever an interrogation is to begin I have always laid out the case showing the strength of our case, stating what we have, in effect being completely honest with the defendant.

Q Did you do that with the defendant, Mr. Ponds?

A Yes, sir.

Q This is in regard to what case that you were as you say you were laying out the case, what case were you talking about?

A This would be the case for which he was ar-

rested that we had the warrant, the Ranier case.

Q Detective McFee, prior to the time that you talked with him you indicated that you laid out what it was that you had, the words you used were what the case was. What did you tell him in that regard?

A Basically I indicated the reason for having obtained the warrant, why we had the warrant, why he was being charged. I indicated to him the probable cause that we had obtained.

Q What did you tell him first of all with regard to the facts of the case that you had against him?

A You mean specifically those points?

Q That is correct.

A I mentioned to him the fact the co-defendant had been arrested and had given a statement and mentioned that he had received information as to his involvement. I mentioned to him that we were aware of the location where the property was stolen from, this particular burglary. As I recall I made a general statement we did not just arbitrarily pick his name out of a hat, but we had him and we had a strong case.

Q After you got to the point in time where you had laid out to him the basic facts or the evidence that you had against him, what was his expression, if any, with regard to a desire to talk to you about the case, the Ranier case?

A The defendant paused for a reasonably good length of time, several minutes, and he thought and then he looked up and he started looking at me — I don't recall exactly how he phrased it, but it was to the effect of O. K. you sold your bill of goods. You sold your car. Where do we start.

Q Did you at any time have any discussion with the defendant, Rickey Ponds, with regard to the serving of a warrant for other cases, other than the Ranier case?

A Yes, sir, I did.

Q When did you have that conversation in the first place?

A After we had concluded the initial case.

Q The Ranier case?

A The Ranier case.

Q What did you say to him about those warrants?

A I prefaced it by stating to him that I myself and several of us in the office had spent a great deal of time investigating various burglaries that had occurred in the area, in the Flower Valley Area. I indicated to him that we had compiled quite a bit of statistics, times and dates and I showed him the yellow list that indicated the addresses and dates and locations of these various offenses. I stated to him that I — I do not recall my exact words — but it was something to the effect that he did very well on the first case and now let us go on from there. Let us get everything straightened out this evening. We do not want to have to go back at a later date for additional warrants, let's get everything straightened out right now.

Q I believe you indicated to me, Detective McFee, when we talked about this a few days ago that you did say to the defendant at a time prior to the elicitation of the admission or confession that there would come a time when he would be a defendant and would be in a position to be sentenced and that at that time, if he cooperated with you — I am trying to get these words in substance. I know I do not have

them accurately — that you would be in a
position to put in a good word for him to the
judge. Now am I correct in that or words to that
effect were stated to him prior to the elicita-
tion of the admission or confession?

A  You are incorrect, sir."

We observe that under Ponds' testimony the alleged
inducement by McFee was made *after* the latter had "shown
[Ponds] a yellow pad which had 15 names and addresses on
it. Ranier was the bottom one. There were 14 other
burglaries plus the Raniers." On the other hand, McFee
testified unequivocally that Ponds had confessed to the
Ranier offense *before* any reference was made to other
burglaries. Officer Staccone also stated categorically that
McFee had made no reference whatever to other offenses
before the Ponds' confession in Ranier was made.

The brief of appellant suggests that his confession must be
deemed inadmissible because "He [McFee] was not asked
nor did he testify whether or not he promised to assist the
defendant in getting out on personal bond that night." It is
true that no specific denial of those specific words are to be
found in the record. We note again, however, the Ponds'
testimony relating to the time of the alleged inducement:

"Q  When was this, [the alleged inducement] be-
fore any statement was made?

A  This was before my statement was made."

Thus the trier of facts was confronted by the necessity to
resolve the critically dispositive conflicting testimony. If the
trial judge believed the testimony of McFee and Staccone,
there manifestly was no promise that induced the Ranier
confession. On the contrary if the trial judge believed the
testimony of Ponds, the Ranier confession was involuntary.
He chose to believe the former and reject the latter. The
record contains substantial evidence to support the choice he
made.

Thus there is, in the subject case, no such condition as was
the case in *Streams* and *Gill,* both *supra,* wherein the record

demonstrated uncontradicted evidence that the confession was coerced.

We are persuaded from our own independent review of the entire record, that the totality of the attendant circumstances demonstrates that the asserted inducement was denied by necessary implication and that the conclusion of the trier of facts that the testimony of the appellant "is not worthy of belief" should be accorded "appropriate and substantial effect * * * because the trial judge * * * [is] closest to the trial scene and thus afforded the best opportunity to evaluate contradictory testimony."*Haynes v. Washington, supra.*

We find, accordingly, that the confession was without constitutional taint.

*Judgment affirmed.*
*Costs to be paid by appellant.*

*Moore, J., dissenting:*

The majority opinion concedes that the police officer was not asked nor did he testify as to whether or not he promised to assist the appellant "in getting out on personal bond that night," as appellant had testified. In my view, the decision of the Court of Appeals in *Streams v. State,* 238 Md. 278, 208 A. 2d 614 (1965) required a specific denial of those specific words. I do not agree that *Streams* is distinguishable and I conclude that the State failed in its obligation to show preliminarily that the statements of the appellant were voluntary since it failed to recall the police officer to refute, if he could, appellant's charge of a promise to be released on personal bond and go home that evening. Accordingly, I would reverse and remand for a new trial.