# STATE OF MARYLAND *v.* FOWLER

[No. 345, September Term, 1969.]

*Decided July 17, 1970.*

96

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, and SINGLEY, JJ., and re-argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*William E. Brannan, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edward F. Borgerding, Assistant Attorney General,* and *Charles E. Moylan, Jr., State's Attorney for Baltimore City,* on the brief, for appellant.

*William J. McCarthy* for appellee.

FINAN, J., delivered the opinion of the Court. BARNES, SINGLEY and SMITH, JJ., dissent. Dissenting opinion by BARNES, J., in which SINGLEY and SMITH, JJ., concur, at page 108 *infra.*

This case is before us on a writ of certiorari to the Court of Special Appeals. On November 6, 1966, Linda Keller, a nurse's aide, was found brutally beaten and knifed at Church Home and Hospital in Baltimore. She died five days later without ever having regained consciousness. On March 25, 1967, William Fowler, the defendant was taken into police custody. After six days of interrogation, Fowler signed a confession admitting to the murder of Miss Keller.

The defendant was indicted for first degree murder and rape. The case was tried before a jury in the Criminal Court of Baltimore with Judge Perrott presiding. The confession, which was the major piece of evidence produced by the State, was introduced over the objection of defense counsel that it was not voluntarily given and that

the defendant had been denied his *Miranda* rights. Judge Perrott ruled the confession was admissible after hearing testimony concerning its voluntary nature out of the range of the jury. On July 30, 1967 the jury returned its verdict finding the defendant guilty. The court imposed a life imprisonment sentence for the murder charge and a twenty year term for the rape count.

The case was then appealed to the Court of Special Appeals. Writing for the Court, Chief Judge Murphy, in an able opinion, held the confession should not have been admitted because the defendant had been denied his constitutional right to the assistance of counsel. Upon petition by the State we granted a writ of certiorari to the Court of Special Appeals.

The issue before this Court is the admissibility of the confession into evidence at the defendant's trial. To reach a decision on this point, the highly complex factual situation which led to the confession must be closely examined. On March 25, 1967, more than five months after the slaying, Detective Vincent DiCarlo of the Baltimore City Police Department went to Fowler's house to question him in connection with the theft of a money order. He was taken to Northeastern Police Station, in the City of Baltimore, where he was interrogated from 4:30 to 5:30 P.M. by Sergeant Charles Siford. The interrogation did not concern the Keller homicide. A reading of the record reveals that the warnings he gave Fowler concerning his constitutional rights, met the *Miranda* test. The record is silent as to what response Fowler made to these warnings.

Siford later interrogated him, that night, from 7:30 to 9:30 P.M. He again advised him of his rights but the record is silent as to Fowler's response.

On March 26, the defendant was further questioned by Siford from 1:45 to 3:45 P.M. During this day he was allowed to talk to his wife and two of his brothers. He was again advised of his rights but the record does not reveal his response.

The following morning he was given a polygraph test.

After lunch he was taken downtown to the Homicide Division offices where he was questioned for the first time about the Keller case. That evening he was placed in a lineup in regard to an unrelated offense. Once again there is testimony that his *Miranda* rights were given but there is no indication as to his response.

On March 28, he was again interrogated by Homicide about the Keller murder. He also spoke to his mother and wife during the day. The record reveals he was advised of his *Miranda* rights prior to questioning but it does not contain any indication of Fowler's response. Testimony of his interrogators reveals that Fowler denied any knowledge of the Keller murder.

On March 29, Fowler was questioned by Sergeant Siford about offenses unrelated to the Keller homicide. He was then given a preliminary hearing on another charge. The result of this hearing was that he was to be held for action of the Grand Jury and placed in the Baltimore City Jail.

For the five day period from March 25 through March 29, the record reveals that Fowler was questioned several times about a number of offenses. On the 27th and 28th he was interrogated about the Keller murder and denied any relation to or knowledge of it. Before each interrogation the officers testified that they warned Fowler of his *Miranda* rights. However, at no point is there any testimony as to his response at hearing these rights.

The defendant's testimony concerning this five day period is that he was advised of his rights only on March 26th. He also testified that he asked the police for an attorney approximately twenty times (this was denied by the police), and that in the interviews with his relatives he asked them to obtain an attorney for him.

This brings us to March 30, the day upon which the confession was obtained. At 3:15 P.M. the defendant was taken from the Baltimore City Jail to Homicide Division for further questioning. He was removed from jail on the authority of a writ the nature and terms of which are not shown in the record. The interrogation began at 3:45

P.M. and was led by Captain Anton Glover in the presence of Officers, Siford, Bosak, DiCarlo, and Folio.

Captain Glover testified that he warned the defendant of his rights as follows:

> "The right to counsel, if he couldn't afford counsel, counsel would be secured, advised he could remain silent, anything he told us could be used in court against him. He was told if he decided to talk to us, he would have counsel present."

The record does not reflect defendant's response to these warnings.

Sergeant Siford testified that at no time did Fowler ask for an attorney. However, defense counsel did elicit the following testimony:

> "Q. Did you ever hear him ask anyone for an attorney?
>
> A. He called his brother in my presence, called his brother in the Homicide room, interrupted interrogation to call his brother to see if he had gotten a lawyer.
>
> * * *
>
> Q. What did he say [on March 30], he wanted to call his brother to get an attorney?
>
> A. Yes.
>
> Q. What was the first date on which he said this, Sergeant Siford? Was it while you had him in custody at Northeastern?
>
> A. No. I'm speaking of the interrogation at Homicide on the 30th, that interrogation was interrupted and he asked to use the phone.
>
> Q. To get an attorney?
>
> A. To call his brother to find out whether or not his brother had contacted an attorney. That is exactly what he said."

Siford further testified that the interrogation continued

100

because Fowler "didn't stress that he wanted an attorney."

> "Q. Did he not express to you the fact that he wanted his brother to get an attorney for him.
>
> A. Sounded like he wanted his brother to get an attorney.
>
>     * * *
>
> "Q. It was your understanding, was it not, that the defendant in this case wanted an attorney through his brother * * *?
>
> A. Yes but it was to no one. We didn't understand that he did not ask for an attorney at this time, at the interrogation, because when Captain Glover advised him, he made it very clear that any time if the defendant wanted the interrogation stopped and wanted the lawyer present, he could so have the lawyer."

At approximately 4:20 P.M., Leonard Briscoe, an attorney, arrived at the interrogation room to speak to Fowler. He had been sent by Milton Allen, an attorney with an office in downtown Baltimore, to interview the defendant. Mr. Allen had been contacted about the case by a member of Fowler's family. Mr. Briscoe testified that he asked to be left alone with the defendant. Captain Glover and Detective DiCarlo acknowledged hearing the request while Officers Siford, Bosak, and Folio testified that they never heard such a request.

Briscoe alleged that there were some officers in the room at all times. Captain Glover maintained that "everyone left the room with the exception of the defendant and counsel." Detective Bosak testified that he thought Glover remained in the room because all of the officers were huddled in one area of the room about fifteen feet from the defendant and Briscoe. The room was approximately 12 by 20 feet.

Sergeant Siford's testimony on this issue is as follows:

"A. Well, I personally went over by the door. I don't know exactly what the other officers did. I think some of them may have went outside. I don't know.

Q. Where was the door in relation to Mr. Fowler?

A. I guess about five or six feet away."

Detective Folio testified that Siford, Glover and Bosak all stood by the door while he and DiCarlo stood alongside the door.

Briscoe reported that because of the proximity of the officers he did not ask appellant about the case. He took down some background information and told Fowler, "Remember you don't have to make any statement." He maintains that he was unaware that Fowler was a suspect in the Keller homicide at the time of this interview. Briscoe admits asking Glover whether Glover had advised Fowler of his *Miranda* rights. Glover responded affirmatively and Fowler nodded in agreement.

Glover testified that at 4:35 P.M. Briscoe called the police back into the room and that he told Briscoe he had advised Fowler of his *Miranda* rights. He then asked Briscoe if he wished to remain and that Briscoe left at 5:30 P.M. to talk to another client. Glover later testified that Briscoe left at 4:35 P.M.

After he left Homicide, Briscoe returned to attorney Milton Allen's office and informed him of what had transpired. Allen then called Captain Glover. Allen testified that he told him to stop questioning Fowler until he got there and that Glover agreed to this. Glover denies receiving such a call.

Upon Briscoe's departure, the police continued their interrogation of Fowler. Detective Bosak testified that until 6:00 P.M. Fowler continued to deny involvement in the Keller murder. At about this time, the defendant asked to speak to Sergeant Siford alone. Siford relates that the defendant began to cry and stated he killed Miss

Keller. Captain Glover was then called in and Fowler repeated what he told Siford. Glover then gave the defendant a written mimeographed waiver form which stated in detail the *Miranda* warnings and concluded as follows:

> "After reading the above and having my rights thoroughly explained to me, I, William B. Fowler, wish to talk to the police without an attorney present and this wish is of my own free volition without any threats or promises."

Fowler signed this waiver at about 6:10 P.M. He then talked to the officers about the crime until 6:40 P.M. From 6:40 to 8:30 P.M. his statement was reduced to writing.

On cross-examination Captain Glover was asked why the waiver was not executed when the defendant was first brought into the room at 3:45 P.M.

> "Q. Having been advised of his rights why wasn't a waiver taken at that particular time?
> A. Why should we take a waiver? He didn't indicate he wanted to give a statement.
> Q. At this particular time, 3:45 P.M. he indicated he didn't want to give a statement?
> "A. He didn't indicate that he did not wish to talk to us.
> Q. What did he indicate?
> A. He spoke to us until such time as Mr. Briscoe arrived."

Fowlers' testimony is that when Briscoe left, Captain Glover threatened to leave him alone with Detective Bosak and that Sergeant Siford told him Bosak would beat him until he confessed. He then alleges that he requested permission to call attorney Milton Allen which was denied. He finally signed the statement because he was "sick of being pressed" and because Captain Glover said that it wouldn't come up in court.

Upon this record, the trial court had to make its determination as to whether the confession should be ad-

mitted into evidence. The trial judge noted that the defendant was never told by his attorney not to talk to the police and that he never made a request directly to the police for counsel. The trial judge posed to himself the analytical question: "Should not the request emanate from the defendant (A) I want counsel; (B) refuse to talk until my counsel is present?" His conclusion was to allow the confession into evidence.

The legal issue before us is clear: Was the confession of the defendant voluntarily given? Any determination of *voluntariness* is to a large degree dependent upon the standards set forth by the United States Supreme Court in *Miranda v. Arizona,* 384 U. S. 436 (1966). A basic premise of that opinion was that confessions obtained through custodial interrogation by police may be unreliable because of the potentially coercive atmosphere which might surround such interrogations. In order to safeguard the reliability of such confessions and to assure that the defendant is aware of his privilege against self-incrimination (Fifth Amendment) and his right to the assistance of counsel (Sixth Amendment), the Court set forward a procedure which the police must follow prior to their interrogation of a suspect. This procedure adopted by this Court and the Court of Special Appeals, in *Miller v. State,* 251 Md. 362 (1968); *Hale v. State,* 5 Md. App. 326 (1968); *Mullaney v. State,* 5 Md. App. 248 (1968); *Brown v. State,* 3 Md. App. 313 (1968); and *Robinson v. State,* 1 Md. App. 522 (1967), includes the enumeration of the following four basic warnings and rights:

(1) The person interrogated has the right to remain silent.
(2) Any statement which he makes can be used against him.
(3) He has a right to consult with counsel and to have counsel present during interrogation.
(4) The State will provide him with counsel if he cannot afford an attorney.

If, in light of these safeguards, a suspect is still willing to make a statement to the police, this is a good indication that the statement was freely made and not the product of a coercive atmosphere.

The *Miranda* opinion makes clear that a mere perfunctory reading of the four safeguards is not enough to assure the voluntariness of the confession. The State has the burden to show that the suspect intelligently and knowingly waived his constitutional rights. Thus the obtaining of the confession is not to be equated to a game between the police and the suspect. Chief Justice Warren, the author of the majority opinion in *Miranda*, was well aware the decision would make it more difficult to obtain confessions, but concluded that more important values would be served by following these procedures.

With this background in mind, we must attempt to ascertain whether the defendant chose to make a voluntary confession to the police after six days of interrogation even though he knew that he could remain silent, that what he said might be used against him, and that he could consult with and have a lawyer present. Our concern is not with whether his choice was tactically wise, but whether it was made with a full understanding of his rights.

There is sufficient testimony in the record to conclude that the police did read and advise Fowler of his *Miranda* rights prior to each interrogation. However, it is of little avail to the defendant to have his rights fully explained to him, if, in fact, they are denied him. It also goes to the heart of the voluntary quality of his actions if a right is exercised in such an atmosphere and under such conditions as to convey to the defendant, intentionally or unintentionally, a wrong impression as to what a specific right may consist of. This strikes at the core of whether he can subsequently make an intelligent waiver of a right regarding which his only knowledge is formed from an abortive and frustrating exposure to it. In the instant case we find an intertwining abuse of the defendant's rights under the Fifth and Sixth Amendments of

the United States Constitution. One of the safeguards provided an accused under the Sixth Amendment is the right to the effective assistance of counsel at all critical stages of the criminal proceedings. *Escobedo v. Illinois*, 378 U. S. 478 (1964). It is also clear that in order to fully implement one's privileges against self-incrimination, the Court in *Miranda* required the police to allow a suspect to consult with an attorney and to have one present during interrogation. See *Duckett v. State*, 3 Md. App. 563 (1968). The testimony of attorney Briscoe, the defendant Fowler, and four of the five officers is that there were at least some officers in the room at all times during the accused's interview with his attorney. The officers were anywhere from five to fifteen feet away from Fowler and Briscoe in a room which was twelve by twenty feet. We do not think this is the type of consultation with counsel which *Escobedo* and *Miranda* envisioned. The *Miranda* opinion emphasizes that it is the psychological effect of the police-dominated atmosphere which tends to have a coercive effect upon the free will of the suspect and forces him to surrender his privilege against self-incrimination. The mere presence of the officers continued the police-dominated atmosphere in which the suspect had found himself for the last six days. Their mere presence may have intimidated Fowler from inquiring of Briscoe about the extent of his *Miranda* rights or from revealing to his counsel any abuses to which he may have been subject. We also note that Briscoe told the defendant not to reveal anything about the case because the officers might overhear it. However, Briscoe was not even aware at that time that the man was a murder suspect. Had he been able to consult in private, he may have found this out and perhaps would not have left Fowler alone. He may have advised him as to other matters vital to his defense. While this may be speculative, the burden is not upon the defendant to demonstrate what would have happened had he been accorded his right to consult with counsel.

The dissenting opinion emphasizes the fact that the po-

lice officers present, while attorney Briscoe was in the interrogation room with the accused, could not overhear the conversation between Briscoe and the accused and implies that the circumstances provided all the safeguard necessary to assure effective communication between attorney and client. This rationalization misses the point, that it is not the question of whether the police officers could overhear the conversation between Briscoe and the accused, but rather whether the presence of the officers created or gave the impression to Briscoe and the accused that their conversation was being monitored and thus prevented effective communication between the accused and his counsel, as contemplated by *Escobedo* and *Miranda*.

Writing for the Court of Special Appeals, Chief Judge Murphy stated: "We do not hold that an accused undergoing custodial interrogation is denied the effective assistance of counsel in every case where a police officer is present in the area of the attorney-client consultation. The right of the person being questioned to consult with an attorney may, of course, be subjected to reasonable security safeguards," 6 Md. App. at 672. The dissenting opinion offers security reasons as the justification for the presence of police officers in the doorway of the interrogation room or in the room itself. The opinion further proposes that the officers may have thought that the accused might attempt to commit suicide and suggests that this is indicated by the fact that the accused had been required to remove most of his clothing. We view this latter precaution as nothing more than routine custodial procedure, as it is almost a standard operation in a place of detention to require the person incarcerated to remove belt, suspenders, necktie and even heavy shoelaces. In the case at bar it is a gratuitous assumption, not warranted from the facts contained in the record, to infer that the officers remained in the interrogation room for security reasons.

In this posture of the case, the fact that Fowler, a few hours later signed a waiver of his right to consult with counsel is hardly meaningful. His only acquaintance and

experience with this right was an interview at which time he was surrounded by his inquisitors. Thus he could not have fully understood the right which he waived. *Rock v. State,* 6 Md. App. 618 (1969), and *Hale v. State,* 5 Md. App. 326 (1968). Thus, this denial of his right to effective consultation with counsel, guaranteed to him under the Sixth Amendment, may well have resulted in an erroneous judgment on his part regarding the nature of the right to counsel. This in turn affects the quality of his volition in executing the waiver of his rights under the Fifth Amendment.

It is not our purpose or intent, by this opinion, to enlarge the scope of *Miranda*; however, we deem it appropriate before concluding, to register our approval of the change in the practice of the Baltimore Police Department. Presently, they obtain a written waiver from the accused of his rights, as enunciated by *Miranda,* prior to interrogation instead, as was done in the instant case, of waiting until after six consecutive days of interrogation. See *Fowler v. State,* 6 Md. App. 651 at 659.

We are also disconcerted by those facts in the record which reveal, through the State's own witness, that questioning continued after the accused indicated that he wanted his brother to secure an attorney for him. The *Miranda* opinion provides: "If he [accused] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning." Sergeant Siford (who had played "Jeff" to officer Bosak's "Mutt" in a sequence similar to that mentioned by Mr. Chief Justice Warren in *Miranda,* 384 U. S. at p. 466), testified that, "it sounded like he wanted his brother to get an attorney." Since the record is silent as to any response made by Fowler after the *Miranda* warnings were read each day, this testimony raises the question that there was a strong probability that neither the accused or the officers understood that he could have an attorney present before there would be further questioning. Sergeant Siford's apparent rationalization is that the questioning continued because the accused "didn't

stress that he wanted an attorney." There is nothing in *Miranda* requiring emphatic demand on the part of the accused.

In sum, the factual setting under which this confession was obtained does little to inspire the belief that it was the result of a voluntary choice by a person who desired to give a statement knowing full well that he could remain silent and have an attorney present to advise him. We therefore conclude that in the process of obtaining his statement, the defendant's rights under the Fifth and Sixth Amendment of the Constitution of the United States were violated and accordingly it should not have been admitted into evidence.

> *Judgment of Court of Special Appeals, reversing judgments below and remanding case for new trial, affirmed. Appellant to pay costs.*

BARNES, J., dissenting:

I dissent because it is clear to me that (1) the majority of this Court (as did the Court of Special Appeals) has substituted *its* evaluation of the facts in regard to the voluntary character of the confession for that of the trial court and the jury whose findings were amply supported by the record; (2) even upon the "facts" set forth in the majority opinion, the *holdings* of the Supreme Court of the United States in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966) and in *Escobedo v. Illinois,* 378 U. S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) do not require the holding in the majority opinion; (3) the opinion of the majority of this Court (as did the opinion of the Court of Special Appeals) has made an unwarranted and unwise *extension* of the holdings in *Miranda* and *Escobedo* which will most likely result in substantial injury to the public in the enforcement of the criminal law in this State; and (4) the holding in the majority opinion is contrary to our decision in *Miller v. State,* 251 Md. 362, 247 A. 2d 530 (1968).

## (1)

In view of the fact that my analysis of the testimony in the record in this case indicates a rather different factual picture than the one appearing in the majority opinion, it is wise to set forth at the beginning, what I understand to be the tests for appellate consideration of the facts in the trial court after they have been evaluated and found by the trial court, on a motion to suppress a confession as involuntary, and by the jury, on the trial of this issue on the merits.

In *Miller, supra*—a post *Miranda* decision—Judge Marbury, for the Court, set out the scope of appellate review as follows:

> "The determination of whether a confession is admissible is ordinarily a matter for the trial court to decide and its determination will not be disturbed on appeal unless there is a clear abuse of discretion. *Abbott v. State,* 231 Md. 462, 190 A. 2d 797. *Bryant v. State,* 229 Md. 531, 185 A. 2d 190; *Harris v. State, supra.*"
> (251 Md. at 381, 247 A. 2d at 540.)

Chief Judge Murphy, for the Court of Special Appeals, in a unanimous decision of that Court in *Robinson v. State,* 3 Md. App. 666, 240 A. 2d 638 (1968) had anticipated our decision in this regard in *Miller,* and, after a careful review of the applicable Federal cases, stated:

> "It is well settled that in order for a confession to be admissible into evidence against an accused, the State must prove that it was voluntary and not the product of force, threats, promises or inducements. *Abbott v. State,* 231 Md. 462; *Cooper v. State,* 1 Md. App. 190. Otherwise stated, to be voluntary, a statement cannot be 'extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' *Malloy v. Hogan,* 378

U. S. 1, 7; *Lyter v. State*, 2 Md. App. 654. In post-*Miranda* trials, where the State seeks to introduce a statement taken from an accused during custodial interrogation, it must, as part of its proof of voluntariness, affirmatively show that all warnings required to be given to an accused by that case prior to such interrogation were so given, *Robinson v. State*, 1 Md. App. 522, and that the accused, in giving the statement, understood his rights and knowingly and intelligently waived them, *Johnny Mack Brown v. State*, 3 Md.App. 313. The basic standard governing the admissibility of an extrajudicial statement is whether, considering the totality of the circumstances, the statement was voluntary. *Clewis v. Texas*, 386 U. S. 707; *Taylor v. State*, 238 Md. 424; *McFadden v. State*, 1 Md.App. 511. Within this constitutional framework, the question of whether a confession should be admitted in evidence is ordinarily a matter for the trial court to decide and its determination will not be disturbed on appeal unless there was a clear abuse of discretion. *Cunningham v. State*, 247 Md. 404; *Carrington v. State*, 1 Md.App. 353.
(3 Md.App. at 670-71, 240 A. 2d at 641.)

In a rather recent case, *Dennis v. Warden*, 6 Md.App. 295, 251 A. 2d 909 (1969), Judge Orth, for the Court of Special Appeals, aptly summarized the applicable law as follows:

"Dennis [the post conviction petitioner] has now received full and fair hearings at which he invoked a substantive test for voluntariness of his statements and presented evidence on the issue. While the general rule is that the determination of admissibility of a confession is left largely to the trial court, and will not be disturbed unless there is a manifest abuse of dis-

cretion, *Cooper v. State,* 1 Md.App. 190, 228 A. 2d 840 it is our duty on review to examine the entire record and make an independent determination of the ultimate issue of voluntariness. *Davis v. North Carolina, supra,* 384 U. S. at 741-742, 86 S. Ct. 1761, 16 L.Ed.2d 895. As is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict here in the testimony as to the events surrounding the interrogations. But we are not a finder of facts; the weight to be given evidence and the credibility of witnesses are matters for the lower court. *Gibson v. State,* 4 Md.App. 222, 242 A. 2d 204."

(6 Md.App. 315, 251 A. 2d at 920.)

As applied to the present case, the approach of this Court on appeal to the facts must be to resolve all of the conflicts in the evidence and all reasonable inferences from the evidence in favor of the findings of the trial court and of the jury and only to reverse the trial court upon the admissibility of a confession where there is a showing of "a *clear* abuse of discretion." (Emphasis supplied.) *Miller, supra.* On appeal, the *totality* of circumstances is to be considered, not some isolated fragments of possibly conflicting evidence by a witness, either for the prosecution or for the accused.

In this legal framework, the record, as I have read and analyzed it, reflects the following facts:

Linda C. Keller, the raped and murdered girl, was a seventeen year old nurse's aide, often referred to as a "pinky," at the Church Home and Hospital in Baltimore City. On November 6, 1966, she had lunch with a student nurse, Donna DiSisco, in the hospital's second floor cafeteria. She left alone at 11:40 A.M. to return to her duties on the fifth floor, but she never reached her destination. A report was sent to the security division that a "pinky" was missing from the work assigned to her.

A part-time security guard at the hospital, shortly be-

fore 4:15 P.M., in his search for the girl, pushed open a partially ajar door to the boiler room of the hospital. He heard moans and found the victim in a nude condition, her head bloodied and her body dusty all over. He went for help to the Emergency Room, the victim was carried there where she was first treated by Dr. Jose Ortez for multiple stab wounds.

On the same day at 10:50 P.M., Dr. George Wells, Jr., a gynecologist employed by the Police Department of Baltimore City, examined the victim. He found a fresh tear at the bottom of the vaginal opening and concluded from his findings that the vagina had been forcefully penetrated by something shortly prior to the examination.

The victim died on November 11, 1966, at 11:16 P.M. Her body was examined by Dr. Rudiger Breitnecker at the Office of the Medical Examiner on the following day, November 12. The examination disclosed a severe fracture to the skull, and 28 stab wounds made by a narrow, sharp instrument. Eight of the stab wounds were in the victim's chest, two penetrated the lungs and two entered the heart—one wound having an entry hole of one-fourth of an inch in width, the other about one-eighth of an inch in width. One sharp instrument was used to make all of the wounds. Dr. Breitnecker concluded that the victim's death was caused by "severe head injuries with skull fractures and brain contusions and, in addition, multiple stab wounds of the chest and abdomen, with injury to the heart and lungs and the intestines."

Inasmuch as the principal evidence of the State against the defendant, William Bobby Fowler, was a confession obtained from him on March 30, 1967, the trial court heard extensive testimony out of the presence of the jury (a jury trial having been elected by the defendant) and ruled that the confession was admissible in evidence as having been voluntarily given with no denial of the defendant's constitutional rights. The evidence produced on the preliminary issue of the admissibility of the confession, which supports the trial court's ruling, was substantially as follows:

Detective Vincent DiCarlo went to the house of the defendant at approximately 11:00 A.M. on March 25, 1967, in connection with the investigation of an entirely unrelated charge to the ones involved in the present case. The defendant invited Detective DiCarlo to come in and offered him a beer, which Detective DiCarlo declined, remarking that he was not permitted to drink while on duty. He then confronted the defendant with the fact that the defendant had recently purchased some clothing with a stolen money order. The defendant admitted endorsing the document, saying that he had won it in a crap game. He voluntarily showed Detective DiCarlo the clothing he had purchased. Thereafter, the defendant was taken to the Northeastern Police Station and was booked there at about 11:15 A.M.

Sergeant Charles Siford testified that he advised the defendant of his constitutional rights as follows:

"I advised him of his absolute right to remain silent. Also, anything he said would be used against him in Court. Advised him there would be no threats or no promises made to him. Also, he had a right to have a lawyer, that if he couldn't afford a lawyer, one would be appointed for him and that during any interrogation if he expressed the desire to have a lawyer present, that all interrogation would cease until a lawyer was made available and if one wasn't made available, there would be no more interrogation."

This occurred at about 4:30 P.M. The interrogation — not concerned with the charges in the instant case—continued until 5:30 P.M. After the defendant was given his evening meal, the interrogation began again at 7:30 and lasted until 9:30 P.M. Again, the defendant was advised of his *Miranda* rights.

On March 26, the following day, the defendant talked to his wife from 8:50 A.M. to 9:08 A.M. and during the morning was visited by his brother, Leroy, who talked

to him from 9:40 to 9:52 A.M. The defendant was given all of his meals. During the evening he was visited by another brother.

On March 27, the defendant took a polygraph test. At 2:55 P.M. he was taken to the Homicide Squad for questioning (presumably in connection with the Keller case), was given the *Miranda* warnings, and was interrogated for "four or five minutes." During the evening he was placed in a line-up in regard to an unrelated offense.

On March 28, the defendant was visited by his mother and his sister. Following lunch, he was taken to the Bureau of Identification and then to a preliminary hearing before the magistrate on an unrelated charge. This hearing was postponed and the defendant was then taken to the Homicide Squad for further questioning in regard to the Keller case, stopping on the way there at the defendant's home for a visit with his wife and his newborn child. When Sergeant Siford was asked on cross-examination if this was "an act of kindness on your part?", he answered, "No, not necessarily so. . .He indicated the desire. It wasn't out of the way. We had to go practically by the place." He also recalled that during the year, he had taken an accused to his mother's home. He was again given the *Miranda* warnings. At the short interrogation by the Homicide Squad, the defendant gave the police no information. Detective Bosak, who was present at that interrogation stated on cross-examination:

> "Q. What was this interrogation about?
> A. It was in reference to the Pinkie case but we couldn't get any information whatsoever out of Mr. Fowler.
> Q. He didn't want to talk to you?
> A. No.
> Q. He told you?
> A. He said he didn't know anything about it.
> Q. Denied any implication in this so-called Keller case at this point?
> A. Yes."

The following day, March 29, the defendant made two telephone calls to his mother and was again interrogated by Sergeant Siford in connection with offenses unrelated to the present case. Again, the defendant was given the *Miranda* warnings. Later that day the defendant was given a preliminary hearing before the magistrate on an unrelated charge, was held for the action of the Grand Jury and was thereafter placed in the Baltimore City Jail.

During this entire period from March 25 through March 29, the defendant had been in custody at the Northeastern District. The defendant had only been interrogated on four separate occasions by Sergeant Siford, solely on charges unrelated to the present case. At no time was any force or violence used upon the defendant nor were any threats or inducements held out to him.

In the majority opinion, as in the opinion of the Court of Special Appeals, there is a "litany" with the giving of the *Miranda* warnings by the police as the "versicle," with the "response" being that the record is silent as to Fowler's response to those warnings. This is apparently intended to suggest that the defendant did not or might not understand the *Miranda* warnings, but as will later be pointed out the record will show that he did indeed understand them. The reason no formal written waiver was taken at these times was easily explained by Captain Anton T. Glover, on cross-examination when he was asked in regard to the *Miranda* warnings prior to the confession. "Q. Having been advised of his rights, why wasn't a waiver taken at that particular time?" to which Captain Glover replied: "A. Why should we take a waiver? He didn't indicate he wanted to give a statement."

On March 30, the day the defendant gave the confession, the defendant was transferred from the Baltimore City Jail to the Central Police Station for interrogation upon a writ signed by Judge Grady on March 30 at about 3:00 P.M. The defendant arrived there at approximately 3:45 P.M., and interrogation was undertaken by Captain Glover in the presence of Sergeant Siford and Detectives

Bosak, DiCarlo and Folio. Captain Glover advised the defendant of his *Miranda* rights. During the first part of the interrogation, the defendant admitted knowing the victim and having worked at the hospital on the day of the commission of the crimes, but denied that he had committed them. At approximately 4:20 P.M.[1] the interrogation was interrupted by the arrival of Leonard Briscoe, an attorney. In view of the importance the majority opinion appears to give the supposed denial of "the effective assistance of counsel," a rather full account of the background and course of Mr. Briscoe's appearance and course of conduct should be given.

Many of the relevant facts are undisputed. Mr. Briscoe has his law offices at One Charles Center near those of Milton Allen, another member of the Maryland Bar who has specialized in criminal law practice for some 20 years. The two attorneys are close friends and Mr. Briscoe frequently assists Mr. Allen with certain aspects of his criminal practice including the interviewing of clients confined in penal institutions. Relatives of the defendant had communicated with Mr. Allen in regard to his representation of the defendant. He had agreed to represent him and the relatives were to bring in his retaining fee the following Saturday. Mr. Allen asked Mr. Briscoe on March 30 to interview two clients, the defendant and one William Wesley Harris. Mr. Briscoe agreed to do this and went to the Central Police Station to interview the defendant. At about 4:20 P.M., Mr. Briscoe arrived at the room in which the defendant was being interrogated and inquired if the defendant Fowler was there. Captain Glover testified:

> ". . .at approximately 4:20 P.M. Mr. Leonard Briscoe, an associate of Mr. Milton Allen came and requested to talk to his client. We took Mr.

---

1. Captain Glover in the first part of his testimony erroneously stated that the Briscoe interview began at 4:35 P.M. and ended at 5:30 P.M. Later in his testimony he gave the correct times, *i.e.*, the interview began at 4:20 P.M. and ended at 4:35 P.M. These correct times for the interview were confirmed by the testimony of Detective Bosak.

Briscoe into the room. We told the defendant, Fowler, Mr. Briscoe represented Mr. Allen, if he wished to talk to him. He said he did. * * * We told Mr. Briscoe what we were talking to him about. He stated he was there as a representative of Mr. Allen. He asked me if I knew the Defendant's rights. I told him I did. * * * He had been so advised. In order to make sure it was understood properly, I repeated the rights to Mr. Briscoe and the Defendant together. * * * I told Mr. Briscoe he understood the rights of the Defendant, which were that the Defendant had a right to remain silent. . . , if he could not afford counsel, counsel would be obtained for him. What he said would be used against him. * * * He was told that if he decided to talk to us, he could have his counsel present."

Detective Folio testified that he got up and gave Mr. Briscoe the chair in which he had been seated. Mr. Briscoe and the defendant were in one corner of the room, estimated to be some 20 feet x 12 feet in size, while the officers moved to the other side of the room near the door. Some of the officers were just outside the door, some were inside the room near the door. The testimony in regard to the estimated space between the defendant and Mr. Briscoe, on the one hand, and the officers on the other, varied from 6 to 8 feet to 15 feet. Most importantly, however, the officers testified that they could not hear what Mr. Briscoe and the defendant were saying to each other. Detective Bosak testified:

"I couldn't hear what he was saying. I was at the other end of the room. It's a large room and he was over the other end, talking with his client. . . .We were all huddled in one area. Mr. Briscoe was huddled by himself with Mr. Fowler."

"Q. You were not able to hear what they were saying? A. No, Sir.

"Q. Were the other officers with you on the other side of that room? A. Yes."

On cross-examination, Detective Bosak stated:

"Q. I believe it is your testimony there did come a time Mr. Briscoe and his client, Mr. Fowler ended up in the corner of the room? A. Yes sir, we moved away from him.

"Q. When did this come about? Did not Mr. Briscoe ask to be alone with his client? A. No sir. [I] got up, moved away.

"Q. Why did you move away? A. Courtesy to Mr. Briscoe and his client.

"Q. What did Captain Glover do, stand up, walk to the other side of the room? A. After Mr. Fowler and Mr. Briscoe were introduced, sat down. Mr. Fowler was advised of his rights he had. He talked to him and we moved to the other side of the room.

"Q. Just automatically moved to the other side of the room? A. Yes sir, walked."

Sergeant Charles Siford also testified that Mr. Briscoe never asked to be left alone with his client. Sergeant Siford moved from the chair where he was seated. He was asked on cross-examination:

"Q. Why is it you moved? A. Well the reason I moved, Mr. Briscoe started talking to his client, more or less closer to him, and I couldn't understand what he was saying. I got up from my chair, walked toward the door. [He stayed] maybe a foot away from the doorway."

Detective Folio testified that when he gave his chair to Mr. Briscoe he walked to the door, where he could not hear any of the conversation between Mr. Briscoe and the defendant.

It is clear from the record (to be considered in its entirety on appeal, *Dennis v. Warden, supra.*) that the po-

lice officers considered the defendant to be a security risk and for this reason they kept the door of the room open and themselves in readiness. They evidently believed the defendant might try to commit suicide or try to escape, using the window in the room or using Mr. Briscoe as a "shield." Captain Glover testified:

> "Fowler had been deprived of most of his clothing with the exception of his trousers or pants because of his activities preceding this."

On cross-examination Captain Glover testified:

> "Q. When you say you left the door ajar, what do you mean, left the door open? A. Open in case the Defendant decided he wanted to leave. We wanted to be in a position to get back in."

Mr. Allen testified that one purpose of having Mr. Briscoe interview the defendant was to obtain a retaining fee. The defendant's employer (the hospital) was holding a pay check for him and Mr. Briscoe was to get the defendant's signed authorization for Mr. Allen to obtain the pay check. The written authorization was prepared and given to Mr. Briscoe for execution by the defendant. The defendant, Fowler, testified that in this regard Mr. Briscoe "showed me the piece of paper which, you know, was they asking me did I want to sign my check over to him and everything so he could pick up my check, and I read it, signed my name agreeing he could pick up my check for a fee, pay the lawyer."

Mr. Briscoe testified that in addition to obtaining the authorization and other personal data from the defendant, "I told him [Fowler] 'Remember you don't have to make any statement' and I would attempt to see him in the morning at the Baltimore City Jail, whereupon I began to leave. One of the officers asked me for my card as I was leaving and I gave it to him." Mr. Briscoe's testimony also reveals that when Captain Glover said in his presence that the defendant had been advised of his rights, the defendant "nodded" affirmatively. The defen-

dant testified at the trial that this nod was motivated by fear and intended "just to satisfy him [Captain Glover]."

Sergeant Siford testified in regard to the departure of Mr. Briscoe as follows:

> "The Court: Did he (Briscoe) indicate a desire to remain in the room while any continued interrogation should go forward?
>
> "The Witness: No. That surprised everybody. Mr. Briscoe said he had other business.
>
> "Q. (By Counsel for the State) Was he asked to remain or invited to remain?
>
> "A. I took it for granted he was going to remain if he represented him. I was more or less stunned really. Believe he said he had to go to City Jail."

Captain Glover testified:

> ". . .I asked Mr. Briscoe if he wished to remain.
>
> "Q. What was his response to that? A. Mr. Briscoe stated he had to go to City Jail and talk to another client."

Mr. Briscoe left at 4:35 P.M. and the interrogation was resumed. It was interrupted by the defendant eating a hot meal. It was then continued until about 6:00 P.M. when the defendant said he wanted a few minutes to meditate. After saying a prayer, he indicated he wanted to talk alone to Sergeant Siford. All of the officers, except Sergeant Siford, then left the room and Siford asked the defendant what it was he wanted to tell him. The defendant stated that he had killed the Pinky. Siford asked where and the defendant said at the Church Home and Hospital. Then Sergeant Siford asked Captain Glover to come into the room and the defendant repeated what he had told Sergeant Siford. The other officers then came into the room.

The defendant was then given a written waiver form to read, fill in and sign. The form is upon a letter-size

piece of paper and contains four blanks to be filled in. It reads as follows:

> "I, *William B. Fowler, Sr.* on March 30, *1967* have been advised of my right to remain silent, not to answer any questions without first talking to an attorney, a lawyer. I have further been advised that if I have no means by which to obtain an attorney, the police, must arrange for a lawyer for me if I wish to talk to one, before I answer any questions. I have also been advised that if I choose to answer any questions before talking to a lawyer, whatever I say can be used against me in a Court of law.
>
> "After reading the above and having my rights thoroughly explained to me I, *William B. Fowler, Sr.* wish to talk to the police without an attorney present and this wish is of my own free volition, without any threats or promises in any way.
>
> "(Signed) <em>William B. Fowler, Sr.</em><br><em>924 North Castle Street, City</em><br><em>6:10 p.m.</em>      <em>3/3/67</em><br>Time      Date
>
> "Witnesses:
> - (s)  Captain Anton I. Glover
> - (s)  Sgt. Chas. F. Siford
> - (s)  Det. Richard F. Bosak"

The italicized portions of the completed form are all in the handwriting of the defendant. It appears to me that the signature of the defendant is a sophisticated one and his handwriting indicates that the defendant is a person of some formal education.[2]

After signing the "boiler-plate" form of waiver, as the United States Court of Appeals for the Fourth Circuit has referred to similar forms—see *United States v. Hall,*

---

2. The defendant stated to Mr. Briscoe that he had completed the eleventh grade in the public school system of Raleigh, North Carolina.

396 F. 2d 841, 846 (4 Cir. 1968)—the statement, itself, given by the defendant, begins with yet another advising of his rights. The full statement is as follows:

"[S]tatement of William Bobby Fowler, twenty-three years, 924 North Castle Street, taken in the interrogation room, third floor, police building, Fallsway and Fayette Street on March 30, 1967; 6:40 p.m. Interrogated by Captain Anton Glover, in the presence of Sergeant Charles Siford, Officer Vincent DiCarlo, Officer Joseph Folio, Northeastern District and Detective Richard Bosak. 'Now William before you say anything I wish to advise you that you have the right to remain silent, you do not have to answer any questions without first being able to talk with your lawyer. If you cannot afford a lawyer we will make arrangement for you to get a lawyer, also that anything that you say may be used against you in a court of law. There will be no threats or promises made to you in order to get you to make this statement it must be free and voluntary on your part do you understand what I have just said to you and are you still willing to talk with us about the assault of the "Pinky?" Yes Sir. Now Bobby you were visited a little earlier by a Mr. Leonard A. Briscoe, Attorney at Law associated with Mr. Milton Allen and he informed you that you will be represented by Mr. Allen still knowing this are you willing to talk with us about the assault of the "Pinky?" Yes Sir. Now Bobby after being advised of your rights to remain silent, your right to an attorney and your right to the use of the telephone and knowing what you say may be used in court are you ready to give us a statement concerning the assault and homicide? Yes Sir. Now Bobby we wish to talk to you about an Assault and stabbing which occurred at the Church Home and Hospital on November 6,

1966, where one Linda Keller, w/f, age 17 years of 6821 Roberts Ave. was found assaulted as stabbed in the rear boiler room of the hospital and later died on November 11, 1966, as a result of her injury. Bobby do you know how Linda Keller received the injuries which resulted in her death? Yes. Now Bobby in your own words tell exactly what happened at the hospital on the 6th of November 1966. As I said before from the time that I went to work until sometime before lunch, this occurred during a trip to the Lab, which I was carrying a specimen to the Lab. As I come out of the Emergency Room the side entrance going to elevator "C" I noticed a white female with a Pinky uniform going into the boiler room, she didn't see me so I followed her, I didn't go all the way back, I stopped right by the first door leading to the boiler room. From standing there and peeping around I saw this Pinky go into the first room on the right, I just stood there for about another minute and then I went to the Lab. I came back from the Lab went back into the emergency room stayed about maybe three to five minutes just enough to be seen and I then went back into the following place which is the boiler room as I tipped back to the first room I noticed that she was not there so I again took a few steps to the second room, in peeping in I don't know if she seen me, I noticed that she was taking off her stocking belt, I then tipped back to the first room I waited for about eight to ten minutes, thinking to myself that she was waiting on some one but no one had came. So I come out of the room not tipping this time but in my normal walk and went to the door standing before me was this female she didn't have her clothes on she was nude, she asked me what was I doing back there I replied back "what was she doing back there especially

124

in the nude?" she didn't say anything else she just tried to get by me, I pushed the door to slightly she pushed me, I pushed her, she pushed me again, this lead from push to push one hard shove to another hard shove. The next thing that I remember was her laying on the floor and the blood, I got in something like a rush I left and came back I went to get a brown paper that we use to put clothes in I I think Mrs. Mulligan remembers that. I went back and put her clothes into the bag. I used her dress for a dust cloth to wipe things clean, I brought the clothes out and carried the bag and put it into my locker, I went back to my normal work, and disposed of the bag when I got off from work. I left the bag through the side entrance, I didn't go in the clinic. I left out the entrance near the Employees Office, where the doctors go in and I walked across Fayette Street with the bag to where the Shell Station has all the cars parked just walked the path way to the first trash can in the Projects that where I throwed the bag, I walked over and threw it in just like I had trash. Then I went to my mothers house. Now Bobby do you recall what you used to stab the Pinky with? I didn't have anything with me but I did have my small knife with me on the key chain the one that is over the City Jail. Do you remember where the Pinky was when you left the room? Laying on the floor, she was flat on her back, she was bleeding. How do you know she was bleeding? It wasn't very much just like you would cut yourself on different parts of her body.

"Do you recall any blood on yourself? Yes just like sprinkles on my uniform, I had blood on me and it didn't make to much difference. Bobby do you remember opening the knife? I carry it open all the time on my key chain, I remember

that when I went into the room I had my hand in my pocket anyway. Bobby what was the purpose of going back into the room where the Pinky was? I followed her back to see if she was with anybody else. How often had you seen the Pinky before this time did you know her? I didn't know her, it was about the first time, I don't recall recognizing her.

"Now Bobby I will show you a group of eight photographs with different nurse and groups of hospital personnel see if you recognize the Pinky that you are talking about? Yes this one a photograph of Linda Keller in her Pinky uniform. Bobby you referred to the first room and the second room in the boiler room can you describe them for me? I don't know what they are used for but the first one on the right going in and it would be the left coming out this one had in cardboard boxes. What was in the second room where you met the Pinky? It was a bench and she was getting ready to set down, bag of cement on top of the bench, I think two were in the corner. When you left the room with the Pinky laying there did you remember doing anything? I pulled the door shut. What time did you leave work on the day Bobby? I got off 3:15 and I put the clothes in the trash and went to my mothers. Where were the Pinky's clothes when you went into the room? They were laid neatly on the bench in the room. Bobby do you remember doing anything with the knife that was used? Yes I took the knife and I pushed it in the dirt to get the blood off and I wiped it with a handkerchief, I don't think it was bloody but I wanted to make sure. Bobby are you certain that this is the weapon that was used? Yes sir I used it a number of times I don't know how many it was.

"Did you take anything from her Bobby? No

sir I didn't. What were the clothes like when you saw them? As I said they were off, the bras was white and was in her shoes, the shoes were white and so were her stockings. Do you recall the color of her hair? It was light. Is there anything else that you can tell us about the assault and stabbing at the hospital? No sir that is about all. Now Bobby after you have read this statement consisting of three typewritten pages and you find it to be the truth as you have stated are you willing to sign it? Yes sir. Bobby you have given this statement free and voluntary with out any threats or promises and also you have been advised that you had the right to remain silent and the right to have your lawyer present and still knowing this are you willing to sign this statement? Yes sir I will sign it. Terminated 8:15 p.m. Witnesses—Captain Anton T. Glover, Sergeant Charles F. Siford, Officer Joseph C. Folio, Sr., Officer Vincent J. DiCarlo, Detective Richard F. Bosak, Signed William B. Fowler, Jr., 924 North Castle Street, Baltimore 212 —, Md. Time 8:30 p.m. March 30, 1967.' "

This written statement was signed by the defendant who also initialed the pages of the statement.

A close reading of the written statement and the testimony of the defendant reveals that many of the same words and modes of expression used by the defendant in his testimony also appear in the statement, indicating that the statement was taken down substantially verbatim as given by the defendant.

The record of the trial on the merits indicates that after the statement was taken, Detective Bosak and Sergeant Siford drove the defendant to the Church Home and Hospital. While on the way to the hospital, at 9:30 P.M., they stopped at the defendant's home on North Castle Street. The defendant's wife, Mrs. Della Fowler, came out to the

police car, faced her husband on the back seat, put his head in her hands and asked him in effect "What have they got you in for." The defendant said "up the hospital." Mrs. Fowler said "What do you mean Bobby?" He stated: "I told them I killed the girl at the hospital," at which Mrs. Fowler started screaming and the defendant started crying. Mrs. Fowler repeated "What do you mean?" and the defendant turned to Detective Bosak and said, "Detective Bosak, you tell her." Detective Bosak did so and Mrs. Fowler continued to scream. Sergeant Siford testified that he heard the defendant tell his wife that he killed the girl at the hospital, and the rest of the account given by Detective Bosak. Both Mrs. Fowler and the defendant confirm the substance of this episode except they stated that the defendant never made the statement to his wife, but the statement was made by Detective Bosak. The defendant also stated that he had signed the statement *after* he had returned from the Church Home and Hospital "if I am not mistaken." The visit to the Church Home and Hospital, however, occurred after the visit to the defendant's home just described.

After the visit to the defendant's home, the police car with its occupants, proceeded to the Church Home and Hospital where the defendant went through the rooms where the crimes were committed and pointed out how conditions had changed since the commission of those crimes. Sergeant Siford testified: "He said in his own words that the place had been cleaned up, showed us a bench where some bags or something had been at the time but they had been removed, he said, since then. . . He showed us something about the 'C' elevator, some explanation when he went around to the elevator."

The defendant confirmed the account of the officers in regard to the Church Home and Hospital visit. He stated on cross-examination:

"Q. Did you go into the room where the body was found! * * *

"A. I think I did. Not for sure. I think I did.

"Q. Who else went into the room?

"A. All of us in the room."

Other relevant testimony taken on the merits was:

1. The defendant had a substantial prior criminal record of convictions as follows:

    a. On October 7, 1958, for breaking and entering.

    b. On May 10, 1961, for larceny.

    c. On May 7, 1964, for breaking and entering.

    d. On July 24, 1964, for breaking and entering.

2. The defendant testified that he had been employed at the Church Home and Hospital for eleven months and two weeks prior to his arrest.

3. Mr. Briscoe testified that in taking a statement from the defendant at the time of his visit to him on May 30, he obtained the following information:

    a. His address, 924 North Castle Street.

    b. His telephone number.

    c. The telephone number of his brother, 13 North Denham Street, EE 2-5982.

    d. He was born in Baltimore on December 14, 1943.

    e. He was married and had three children.

    f. He had completed the eleventh grade in the public school in Raleigh, North Carolina.

4. On cross-examination of the defendant the following testimony appeared:

"Q. You liked Sergeant Siford, didn't you?

"A. Did I like Sergeant Siford? What you speaking of, like, that carries a very strong point. No, I didn't.

"Q. You didn't like Sergeant Siford?

"A. No, I didn't."

5. Mrs. Darlene Warwick, a witness for the defendant and formerly employed at the Church Home and Hospital, testified that when there were very ill patients who required restraint, the defendant "was always about to

restrain the patient or he was always able to restrain the patient," from which it can be reasonably inferred that the defendant was a strong, robust type of person.

As the majority points out there were certain conflicts in the evidence principally between the defendant and the police officers in regard to alleged beatings administered by Detective Bosak by slapping the defendant on the face and pushing him off a chair. The defendant, however, never communicated this alleged use of force to Mr. Briscoe or requested any treatment. His face gave no appearance of any alleged beating. All of the officers denied the use of any force or threats of any kind. The trial court and later the jury resolved these conflicts against the defendant.

There were also some conflicts in the testimony between Mr. Briscoe and Mr. Allen and the officers but here again the trial court and later the jury resolved these conflicts against the defendant and in favor of the State. There was most certainly ample evidence to support these findings.

It should be kept in mind also that the police officers involved in the present case were seasoned, well-qualified and highly regarded officers. Captain Glover had been, at the time of the trial, with the Baltimore City Police Department 20 years, with the Homicide Division for almost 15 years and had been Captain of that Division for approximately one year. He had received a 3 star commendation, several Bronze stars, numerous straight commendations and several letters of commendation from the Police Commissioner. Sergeant Siford had been on the force 22 years and associated with the Northeastern District for 12 years. Detective Folio had been on the force 14½ years. Detective DiCarlo had been with the Police Department for 14 years and a detective for three months.

A reading of the defendant's testimony both upon the motion and upon the merits indicates to me that he was not by any means an ignorant, slow-witted person, but, on the contrary, was intelligent, reasonably well educated, articulate and by no means unfamiliar with the police

and their methods of investigation. I daresay the trial court and the jury might very well have reached this same conclusion when they saw and heard the defendant during his testimony.

At the conclusion of the lengthy testimony (some 1047 pages in the transcript), the trial court discussed the advisory charge with counsel and, after argument of counsel, gave a well considered charge to the jury, correctly advising the jury upon the law applicable to confessions and including whether or not the defendant had an opportunity to exercise the right to the choice of an attorney. The trial court stated, in part, that "if you find no opportunity to exercise these rights were afforded to Mr. Fowler throughout the interrogation, you must not consider the alleged admission or confession in arriving at your verdict." No exceptions were taken by either the State or the defendant to the trial court's advisory charge, counsel for both parties replying, when asked if there were any exceptions or requests for additional instructions, "None on behalf of the defense" and "None on behalf of the State," respectively. The jury found the defendant guilty of rape, without capital punishment, and of murder in the first degree, without capital punishment. Judge Perrott sentenced the defendant to life imprisonment on the murder conviction and to 20 years imprisonment on the rape conviction, the latter to run consecutively with the sentence for the murder conviction.

In the majority opinion there are at least two references to "six days of interrogation" and one reference to "six continuous days of interrogation." These statements rather give the impression that the interrogation continued constantly during the six days, but as is pointed out, in part, in the majority opinion, this was not the case. The interrogation on March 25 and 26 had to do with an unrelated matter. On March 25 the interrogation was from 4:30 P.M. to 5:30 P.M. and 7:30 P.M. to 9:30 P.M. On March 26 it was from 1:45 P.M. to 3:45 P.M. The defendant talked on the telephone to his wife and one brother and later was visited by his mother and an-

other brother. On March 27 the defendant was given a polygraph test and was later taken to the Homicide Squad for questioning and placed in a line-up. On March 28 he saw his mother and sister, had lunch, stopped at his home and called his mother in the evening. He was taken to the Homicide Squad for further questioning, stopping en route at his home to see his wife and newborn child. On March 29 the defendant made two telephone calls to his mother and was given a preliminary hearing on an unrelated charge. On March 30, the interrogation did not begin until 3:45 P.M., was interrupted by the arrival and conference with Mr. Briscoe, was thereafter resumed, the waiver and statement being obtained at approximately 6:10 P.M. This is far from interrogation for long uninterrupted periods; indeed the interrogation was almost leisurely.

In my opinion, there was ample evidence from which the trial court and the jury could—as they did—find that the defendant was afforded all of his *Miranda* rights including the right to be silent, to have counsel and the rest. The testimony indicates to me that the defendant fully understood his *Miranda* rights. In the first place, the record indicates that the defendant is intelligent, strong and healthy, 23 years of age, and versed in the ways of crime and police procedures. Secondly, he was in frequent touch with his mother, brothers, wife and sister. He obviously knew he was entitled to have counsel as he telephoned his relatives to obtain counsel for him, which they made an effort to do by consulting Mr. Allen and arranging for representation. Mr. Briscoe actually arrived during the interrogation and conferred with the defendant. To me, to have counsel present and to confer with him, is good evidence indeed that the defendant understood and exercised his right to counsel. He understood perfectly the nature and effect of the authorization to apply his check to a counsel fee and with that full knowledge—remembered and recounted in July 1967 at the trial, four months later—even explained that "fee" meant "pay the lawyer." There was also, in my opinion, ample evidence that

the defendant had all reasonable opportunity to confer with Mr. Briscoe. The majority concedes and the cases establish that the police may take proper security measures and that the right to confer with counsel is subject to such measures. In the present case, it was necessary for security reasons for the officers to keep the door of the room open, but they were able to afford the defendant and Mr. Briscoe sufficient privacy — by moving to the other end of the room—to confer with his client. The evidence is clear that none of the officers could hear what was being said between the defendant and Mr. Briscoe and there is no evidence to the contrary. It was in no way the fault of the police that Mr. Briscoe did not stay for the rest of the interrogation. He was invited by the police to do this, but, for reasons of his own, he left to interview another client.

The majority opinion states:

> "The mere presence of the officers continued the police-dominated atmosphere in which the suspect had found himself for the last six days. Their mere presence may have intimidated Fowler from inquiring of Briscoe about the extent of his *Miranda* rights or from revealing to his counsel any abuses to which he may have been subject. We also note that Briscoe told the defendant not to reveal anything about the case because the officers might overhear it. However, Briscoe was not even aware at that time that the man was a murder suspect. Had he been able to consult in private, he may have found this out and perhaps would not have left Fowler alone. He may have advised him as to other matters vital to his defense. While this may be speculative, the burden is not upon the defendant to demonstrate what would have happened had he been accorded his right to consult with counsel."

This extraordinary statement is indeed "speculation."

As has been pointed out, the defendant was not constantly in the "police-dominated atmosphere." His interrogation was sporadic, not constant. He was in touch with his wife and relations. He was arranging through them to obtain counsel of his own choosing. There was no obligation upon the trial court or the jury to accept Mr. Briscoe's statement, and apparently they did not. Nor is it clear to me that Mr. Briscoe was not aware that the defendant was a murder suspect when he conferred with the defendant. Mr. Allen testified that as a result of his conversation with a relative of the defendant "I knew Fowler was a suspect in the Pinkie case." It is almost inconceivable that Mr. Allen would have sent Mr. Briscoe to interview the defendant and would not have told him with what crimes the defendant was charged. But what does Mr. Briscoe say in this connection? On cross-examination on the hearing on the Motion to Suppress, the following occurred:

> "Q. As you said, generally when you go to visit someone for Mr. Allen, he tells you what they are charged with?
>
> "A. Yes, the particular charge.
>
> "Q. Did you know he was charged with murder and rape?
>
> "A. I couldn't swear to it, but almost sure Milton [Allen] told me what he was charged with."

The trial court could have concluded from this that Mr. Briscoe did know at the time of the conference what charges had been placed against the defendant.

In my opinion, there was ample evidence from which the trial court could conclude that the State had met its burden to show that the defendant's confession was voluntary and that none of the defendant's *Miranda* rights had been violated. As I see it, the majority of this Court and the Court of Special Appeals have substituted their evaluation of the facts for that of the trial court on the

motion and of the jury on the merits. Under the authorities already mentioned, this should not be done.

### (2)

In my opinion, even upon the "facts" set forth in the majority opinion, the holdings of the Supreme Court of the United States in *Miranda* and *Escobedo* do not require or justify the holding in the majority opinion.

It must be clear that not *all* of the 52 pages of the majority opinion of Mr. Chief Justice Warren in *Miranda,* consisting in large part of homily, history, and policy statements prior to reaching the facts in the four cases involved in that decision, are *holdings* of the Supreme Court. Much is interesting *dicta,* which, in view of the vigorous dissents of Clark, White, Harlan and Stewart, JJ., is unlikely to be applied by the Supreme Court in future cases. .

In *Miranda v. Arizona,* No. 759, the accused was questioned by two police officers who admitted that Miranda had not been advised that he had a right to have an attorney present. At the top of a confession obtained two hours later, it was stated that Miranda had made the confession "voluntarily, without threats or promises of immunity and with full knowledge of my legal rights, understanding any statement I make may be used against me." The Supreme Court held that Miranda was not apprised of his right to consult with an attorney and to have one present during his interrogation, nor was his right not to be compelled to incriminate himself effectively protected in any other manner and without these warnings the statements are inadmissible. How different is the case at bar. The *Miranda* warnings were given at least four or five times, the defendant understood them, did consult with counsel during the interrogation and finally confessed under the demands of conscience, not police coercion.

In *Vignera v. New York,* a companion case, there was no warning given and no steps taken to protect the rights of the accused.

In *Westover v. U. S.*, another companion case, there was no warning given prior to the FBI interrogation and there was no evidence of an articulated waiver of rights after the FBI began its interrogation.

In *California v. Stewart*, the remaining companion case, there was no evidence that the accused was advised of his rights and the Supreme Court held that it could not be presumed from a silent record that the police had advised the accused of his rights.

It is quite apparent to me that the present case differs significantly from *all* of the *Miranda* holdings.

The instant case also differs significantly from the holding of the Supreme Court in *Escobedo*. Here again Harlan, White, Clark and Stewart, JJ., dissented. In *Escobedo*, the Supreme Court held that the accused was entitled to the assistance of counsel under the Sixth Amendment to the Constitution of the United States, held applicable to the States through the due process clause of the Fourteenth Amendment, when inquiry began to focus upon the accused as a particular suspect and that the accused had been denied this right when the police denied the accused the right to consult his retained attorney who was present at the police station during his interrogation. In the present case, the police advised the defendant of his *Miranda* rights and the defendant arranged for counsel through his relatives. His counsel *actually consulted* with the defendant during the interrogation and was invited by the police to remain but left for reasons of his own. This is a quite different case indeed from *Escobedo*.

Even the *dicta* in *Miranda* does not render the confession in the present case inadmissible. Mr. Chief Justice Warren stated at 384 U. S. 444-445, 86 S. Ct. 1612, 16 L.Ed.2d 706-707:

> "Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory,

stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries *until he has consulted with an attorney and thereafter consents to be questioned.*" (Emphasis supplied.)

In *Escobedo,* Mr. Justice Goldberg, for the Supreme Court, stated:

"Nothing we have said today affects the powers of the police to investigate 'an unsolved

crime,' *Spano v. New York,* 360 U. S. 315, 327 (STEWART, J., concurring), by gathering information from witnesses and by other 'proper investigative efforts.' *Haynes v. Washington,* 373 U. S. 503, 519. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."
(378 U. S. at 492, 84 S. Ct. at 1766, 12 L.Ed.2d at 987.)

In the present case, the defendant *did consult* with his lawyer, and, in any event, understood the right to remain silent, if he wished, until he consulted counsel or had counsel with him during the interrogation. At one time, he exercised this right.

In my opinion, my view is supported by the unanimous decision of the United States Court of Appeals for the Fourth Circuit (Haynsworth, C.J., Sobeloff and Boreman, JJ.) in *United States v. Hall,* 396 F. 2d 841 (4 Cir. 1968), *supra, cert. den.* October 21, 1968, 393 U. S. 918, 89 S. Ct. 248. In *Hall,* the accused was indicted for robbery of a federally insured savings and loan association. While seated in an automobile with an FBI agent after having been arrested, the agent asked Hall if he could read and write. Before receiving an affirmative answer, the agent handed Hall a printed document containing much of the language of the waiver signed by the defendant in the present case, advising Hall of his *Miranda* rights and waiving those rights. Hall read the proposed waiver, said he understood it and was willing to sign. He signed his name at the bottom of the waiver form and his signature was witnessed by the agent. Hall then gave a detailed oral account of the robbery identifying himself as the man who handed the note to the teller. The agent made notes and filled out a proposed form of written con-

fession which Hall did not sign. Hall asked to telephone his sister, the only person he desired to contact. The agent did not warn Hall of the punishment he might receive if convicted of the crime with which he was charged. In holding the oral confession admissible under the *Miranda* decision, Circuit Judge Boreman for the Fourth Circuit stated:

"It is undisputed that at the time of arrest Agent Dowling did not inform Hall of the punishment he might receive if he were convicted of the robbery with which he was charged. Hall argues that without this knowledge he simply was not in a position to make the knowing and voluntary waiver contemplated by *Miranda*. *Miranda*, however, reflects the Supreme Court's concern that an accused might, to his detriment, forfeit rights afforded him by the Constitution simply because he was not aware that he possessed such rights. We do not find in that decision any intimation that knowledge of the punishment for the crime with which he was charged is a prerequisite to a valid waiver of constitutional rights and we conclude that the validity of Hall's waiver is not vitiated by the admitted absence of knowledge or information as to the possible punishment. Furthermore, we are unable to agree with Hall's argument that he could not validly waive his right to remain silent and his right to the assistance of counsel without the advice of counsel with respect to the waiver itself. Unquestionably this argument goes beyond *Miranda* and Hall so admits. *Miranda* clearly contemplates that an accused may make a valid waiver of his rights without the presence or aid of counsel. This threshold decision is for the accused, and the police are not required to carry about with them a lawyer to inform him of those rights which *Miranda* so obviously envisions will be explained to him by

law enforcement or judicial authorities. The waiver document signed by Hall explained in clear and simple terms that he would be provided an attorney 'now' if he so desired. Clearly Dowling was prepared to afford Hall the assistance of counsel with respect to his initial decision if Hall wished it. *Miranda* requires no more and we are not disposed to fashion such a requirement as here urged.

"From the record it appears that Hall, in all respects, made a voluntary and understanding or intelligent waiver of his rights to remain silent and to the services of counsel. We so conclude, not simply because of the 'boilerplate statement' he signed but also because, on the facts and circumstances surrounding the arrest and waiver, we find nothing to compel a contrary result. Hall himself, as mentioned earlier, did not take the witness stand, even in the hearing in chambers, for the limited purpose of controverting the testimony of Agent Dowling, and we find nothing in the Agent's straightforward and credible testimony to cast doubt upon the correctness of the conclusion reached in the court below. As the Supreme Court suggested in *Miranda*, 'An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver.' *Miranda v. State of Arizona, supra,* at 475, 86 S. Ct., at 1628."
(396 F. 2d at 845-46.)

See also *Coughlan v. United States,* 391 F. 2d 371 (9 Cir. 1968), *cert. denied,* 393 U. S. 870; *Keegan v. United States,* 385 F. 2d 260 (9 Cir. 1967), *cert. denied,* 392 U. S. 967; and *Tucker v. United States,* 375 F. 2d 363 (8 Cir. 1967).

## (3)

Although the majority disclaims any intention "to enlarge the scope of *Miranda,*" I suggest, with respect, that

this is what the majority has in fact done, as did the Court of Special Appeals in its opinion in the instant case. In my opinion, this extension of *Miranda* (and *Escobedo*) is most unwise and will most likely result in substantial injury to the enforcement of the criminal law in this State.

Perhaps the best way to express a portion of my views on this extension of *Escobedo* and *Miranda* is to quote briefly from the dissenting opinions in those cases. The dissenting opinions, indicating the resulting injury to law enforcement of the *holdings* in those cases, apply with even more force to an *extension* of the holdings in those cases.

Mr. Justice White put it well in *Escobedo* when he stated at 378 U. S. at 499, 84 S. Ct. at 1769, 12 L.Ed.2d at 991:

> "I do not suggest for a moment that law enforcement will be destroyed by the rule announced today. The need for peace and order is too insistent for that. But it will be crippled and its task made a great deal more difficult, all in my opinion, for unsound, unstated reasons, which can find no home in any of the provisions of the Constitution."

In *Miranda*, Mr. Justice Clark stated at 384 U. S. 500, 86 S. Ct. 1641, 16 L.Ed.2d 738:

> "The *ipse dixit* of the majority has no support in our cases. Indeed, the Court admits that 'we might not find the defendants' statements [here] to have been involuntary in traditional terms.' *Ante*, p. 457. In short, the Court has added more to the requirements that the accused is entitled to consult with his lawyer and that he must be given the traditional warning that he may remain silent and that anything that he says may be used against him. *Escobedo v. Illinois*, 378 U. S. 478, 490-491 (1964). Now, the Court fash-

ions a constitutional rule that the police may engage in no custodial interrogation without additionally advising the accused that he has a right under the Fifth Amendment to the presence of counsel during interrogation and that, if he is without funds, counsel will be furnished him. When at any point during an interrogation the accused seeks affirmatively or impliedly to invoke his rights to silence or counsel, interrogation must be forgone or postponed. The Court further holds that failure to follow the new procedures requires inexorably the exclusion of any statement by the accused, as well as the fruits thereof. Such a strict constitutional specific inserted at the nerve center of crime detection may well kill the patient."

I suggest that the extension of *Miranda* in the present case may well close the patient's eyes and draw the sheet over its dead body.

Mr. Justice Harlan, in his dissenting opinion in *Miranda* stated at 384 U. S. 504, 86 S. Ct. 1643, 16 L.Ed.2d 740:

"I believe the decision of the Court represents poor constitutional law and entails harmful consequences for the country at large. How serious these consequences may prove to be only time can tell. But the basic flaws in the Court's justification seem to me readily apparent now once all sides of the problem are considered."

Still later, Mr. Justice Harlan stated:

"How much harm this decision will inflict on law enforcement cannot fairly be predicted with accuracy. Evidence on the role of confessions is notoriously incomplete, see Developments, *supra*, n. 2, at 941-944, and little is added by the Court's reference to the FBI experience and the resources believed wasted in interrogation. See

*infra,* n. 19, and text. We do know that some crimes cannot be solved without confessions, that ample expert testimony attests to their importance in crime control, and that the Court is taking a real risk with society's welfare in imposing its new regime on the country. The social costs of crime are too great to call the new rules anything but a hazardous experimentation."
(384 U. S. at 517, 86 S. Ct. at 1650, 16 L.Ed.2d at 748.)

The substantial increase in crime since the *Miranda* decision gives special point to Mr. Justice Harlan's observation.

Apart from the danger of the majority opinion as a precedent, the State's case against the defendant depends largely upon his confession. It is doubtful that the State will be able to prove its case upon the new trial without the confession. As it is rather clear to me from the record that the defendant did the acts which resulted in the terrible rape and homicide in the present case, in my opinion, the public interest is not served by the extension of the holdings in *Miranda* and *Escobedo* in the instant case.

Finally on this point, I must again note that in my opinion the provisions of the Fifth and Sixth Amendments to the Federal Constitution are not properly held to be applicable to the States allegedly through the due process clause of the Fourteenth Amendment. I have expressed by views in several prior dissenting and concurring opinions in regard to this grave error by the Supreme Court, with several of my reasons for this view and with the expressed hope that the Supreme Court, itself, will proceed to correct that error, failing which the error may be cured by Congressional action under Article III of the Federal Constitution or under Section 5 of the Fourteenth Amendment, itself. These are mentioned in my recent dissenting opinion in *Brukiewa v. Police Commissioner,* 257 Md. 36, 78, 263 A. 2d 210, 331

(1970), and need not be repeated here. My point in the present case is that this error is another reason not to *extend* the holdings of cases in which grave doubts exist in regard to their applicability to the States at all.

(4)

Finally, I dissent because it is clear to me that the holding of the majority is contrary to our decision in *Miller v. State,* 251 Md. 362, 247 A. 2d 530, *supra,* decided by a unanimous Court on November 12, 1968.

In *Miller,* cited by the majority on a collateral point, there was involved a brutal murder of a 20 year old girl by Gary Lee Miller, aged 16, in Allegany County on May 27 or 28, 1967. The accused was apprehended on Monday, May 29, 1967, and turned over to the State Police. He was then orally advised of his *Miranda* rights, after which he denied any complicity in the crime. Still later, the accused was again advised of his *Miranda* rights. The accused then said that he wished to give a statement and proceeded to do this by a long oral, inculpatory statement, which the officers reduced to writing but which the accused, after consultation with his parents, refused to sign. At the trial the accused contended that the oral statement was not voluntary under *Miranda,* but the trial court admitted it into evidence. The accused was found guilty and sentenced to death. In affirming the judgment, Judge Marbury, for the Court, stated:

> "Appellant next questions the voluntariness of the oral statement which was admitted into evidence, relying principally upon *Miranda v. Arizona,* 384 U. S. 436 (1966), and *Haley v. Ohio,* 332 U. S. 596 (1948). In the landmark case of *Miranda* the Supreme Court set down the following guidelines governing custodial police interrogation: 'Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attor-

ney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.' 384 U. S. at 444. Both Baker and Chabot testified that the appellant was twice informed of his constitutional rights as stated above in *Miranda*. However, at trial, appellant's counsel objected to the warning given on the ground that Miller 'was not told that if he did answer any questions and changed his mind and then wanted to remain silent he could have remained silent after that.' Since such a warning was not required by *Miranda* we hold that the lower court properly overruled this objection.

"Appellant's main argument urges that the State has failed to discharge its heavy burden imposed by *Miranda* to prove that the individual in custody 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' As defined in *Johnson v. Zerbst,* 304 U. S. 458 (1938), waiver of a fundamental constitutional right is usually 'an intentional relinquishment or abandonment of a known right or privilege. The determination of. . .[which] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' 304 U. S. at 464. However, a statement by the accused that he fully understands and waives his rights is not an essential link in the chain of proof. Waiver may be shown by the attendant circumstances. *United States v. Hayes,* 385 F. 2d 375 (4th Cir. 1967), *cert. denied,* 390 U. S. 1006 (1968) ; *Brown v. State,* 3 Md.App. 313, 239 A. 2d 761.

"In the instant case, there is no allegation that the appellant was mistreated while he was in custody. Both Baker and Chabot stated that

they made no promises or inducement in order to get the appellant to make a statement. See *Robinson v. State,* 3 Md.App. 666, 240 A. 2d 638. The uncontradicted testimony established that Miller was advised of his constitutional rights and then questioned for one hour and thirty-five minutes during which time he denied any implication in the crime. The interrogation ceased. After he had been fed, appellant himself requested to speak with the officers again. At the beginning of this interview, the officers again informed Miller of his constitutional rights. When Mr. Baker asked: 'In view of these facts [warnings], do you wish to give a statement and answer my questions?' the appellant responded 'Yes sir.' We are aware that the Supreme Court has emphasized that admissions of juveniles require special caution. *E.g., In re Gault,* 387 U. S. 1 (1967) ; *Haley v. Ohio, supra.* However, the appellant agreeing to give a statement coupled with the attendant circumstances, that is the proper constitutional warnings at the beginning of each questioning period, no allegations of any police misconduct, and *appellant's own request* for the interview when he gave his inculpatory statement, persuade this Court that the appellant, after careful and deliberate consideration, waived his constitutional privileges, and made his statement voluntarily." (251 Md. at 377-379, 247 A. 2d at 538-39.)

In the present case, the defendant is *23 years of age, signed* the waiver and signed *the confession.* Like Miller, he stated that he wished to make the statement. In addition, the defendant in the present case had counsel with him during part of the interrogation. In short, the case at bar is a far stronger case, in my opinion, than was the *Miller* case for sustaining the voluntary character of the confession and holding that there had been no violation of *Miranda* rights.

As I see it, the present case is no vehicle for a departure from *Miller, sub silentia.* The doctrine of *stare decisis* requires us to adhere to our recent prior decision and every reason of public policy and the sound administration of criminal justice indicates to me that we should do this.

For all of these reasons, I would reverse.

I am authorized to state that Judge Singley and Judge Smith concur in the views herein expressed.